1842.

Attorney General

v.

Life and Fire Insurance Co.

---

### ATTORNEY GENERAL *vs.* THE LIFE AND FIRE INSURANCE COMPANY.

Where an incorporated company, not having banking powers, issued and put in circulation as money the negotiable bonds of the company, not under seal, payable to the order of one of its clerks and endorsed in blank, in the form of the ordinary post notes of banking institutions, and printed upon an engraved plate, with a vignette and other devices which are usual upon bank notes that are issued as a circulating medium: *Held*, that such bonds being issued and put in circulation in violation of the restraining laws, were void in the hands of those who had actual or constructive notice of the purpose for which such bonds were issued; and that the form of the bonds was such as to be constructive notice to those who received them that they were intended to be put in circulation as money, and were not given for any legitimate purpose for which the corporation was authorized to give a negotiable security.

A corporation which is not prohibited by law from doing so, and without any express power in its charter for that purpose, may make a negotiable promissory note, payable either at a future day or upon demand, where such note is in fact made or given for any of the legitimate purposes for which the company was incorporated.

But where such notes have been issued and put in circulation in violation of the restraining law, it seems the holder is bound to show that he received them in the ordinary course of business and paid a valuable consideration therefor, without notice of the illegal object for which they were issued, to entitle him to recover thereon as a bona fide holder.

March 15.

THIS case came before the court upon the exceptions of some of the bond holders of the Life and Fire Insurance Company, to the report of referees. The corporation became insolvent, and upon the application of the attorney general, M. Hoffman and J. L. Lawrence were appointed receivers of its property and effects, under the provisions

of the article of the revised statutes relative to proceedings against corporations in equity. The Mercantile Insurance Company, Josiah Barker, and many other persons who had presented claims to the receivers against the company, arising out of what were usually called the Life and Fire bonds, agreed to a reference, under the provisions of the revised statutes on the subject ; and an order of the court was entered appointing G. W. Strong, Abraham Ogden, and John Bolton referees to determine the controversy relative to the validity of the claims. The form of these bonds was that of ordinary post notes of banking institutions, printed upon an engraved plate, with a vignette and other devices which are usual upon bank notes issued as a circulating medium ; the number, date, amount, payee, and time of payment being left blank in the engraved plate, and filled up in writing, signed by the president of the corporation and countersigned by the secretary thereof, as follows : " The Life and Fire Insurance Company promise to pay, *six months* after date, to *H. Kingsland,* or his order, at their office, *one thousand* dollars with interest at the rate of six per cent per annum from the date thereof, interest payable quarterly. For the payment whereof the company bind themselves and their successors, and have hereunto caused their president and secretary to subscribe their names. New-York, 10 *April,* 1824.

H. ECKFORD, President.

M. L. DAVIS, Secretary."

And these notes were made payable either to H. Kingsland or to some other of the clerks of the company, and endorsed in blank by them ; their names being used for mere convenience to facilitate the operations of the corporation in issuing and putting these bonds in circulation. The objects for which the company was incorporated, originally, were to insure lives, to grant annuities, to open, find out, discover, work, purchase, explore and use mines and beds of coal, and to transport, sell, and dispose of the coal, &c. And by two amendments of its charter, one in 1823, when the name of the corporation was changed, and another

in November, 1824, the corporation was authorized to insure buildings and other property against fire, and to receive and execute trusts, as the Farmers' Fire Insurance and Loan Company was authorized to do. But the evidence before the referees satisfactorily established the fact that the bonds or negotiable securities in question were not given to the payees thereof for any of the purposes specified in the act of incorporation, or in the acts authorizing it to insure against loss or damage by fire or to receive and execute trusts. Nor were they issued, to those who actually received them from the officers of the company, for any of those purposes ; nor for any debts contracted on account of the business for which the company was chartered. The referees arrived at the conclusion, upon the facts produced in evidence before them, that all the bonds belonging to the claimants were illegal and void. They therefore decided and reported that none of the claims of the parties to that reference were lawful or just claims or demands against the effects of the company in the hands of the receivers. They also delivered to the parties a written opinion stating the grounds of their decision ; so much of which opinion as related to the claims of the parties who filed exceptions to their report was as follows :

" In an early stage of the reference in this cause we decided, upon a preliminary objection which was fully argued, that the securities produced and proved, commonly called life and fire bonds, were prima facie evidence of debt against the defendants ; and that the burthen of proof rested upon those who sought to impeach them. In making this decision we adopted the general and well established principle that a corporation cannot transcend the powers delegated to it by its charter ; and that it can lawfully do no acts except such as are expressly authorized, or fairly implied, to enable it to fulfil the ends and purposes for which it was created. But that inasmuch as the corporation was expressly empowered to insure lives, grant annuities, work, explore, and purchase coal mines, purchase real estate for the transaction of its business, and execute

trusts, we were of the opinion that we were bound to pre-
sume that the securities were issued for some of these enu-
merated purposes, until the contrary appeared.

Testimony was then adduced in order to impeach the secu-
rities. And from the uncontroverted evidence of the sec-
retary of the company, who acted as such during the whole
time it was in operation, it satisfactorily appeared that the
bonds in question were not issued for any of the purposes
above specified ; nor for the payment of office rent, clerk
hire, or any of the current or contingent expenses of the
company. This testimony we considered sufficient to re-
but the prima facie presumption in favor of the validity of
the bonds, and to throw the burthen of proof upon the op-
posite party. The bond holders then attempted to sustain
their claims, upon the clause of the original charter which
authorized the company to make loans of its capital stock,
funds or monies, upon bonds and mortgages. Evidence was
produced that in some instances the company did issue its
bonds as the consideration of or in exchange for the bonds
and mortgages of the borrowers, and that life insurances
were connected with and formed a part of the transaction ;
and in particular that a heavy negotiation of this charac-
ter took place between the company and Kenner & Co. of
New-Orleans. And on the argument it was strongly insist-
ed that we were bound to presume that all the securities
were issued under similar circumstances. But we conceive
we are not warranted in making any such presumption—
that it is negatived by the testimony produced before us. And
that if any securities were sustained on this ground alone,
it would constitute an exception to the invalidity of bonds
which were issued under other circumstances. And that it
would be incumbent on these bond holders to bring them-
selves within that exception, by showing satisfactorily, in
each instance, that the bonds were issued for the purpose
of a loan to be secured by the bond and mortgage of the
borrower. Independent, however, of this view of the sub-
ject, we cannot consider these bonds as either the capital
stock, funds or monies of the company. They amount

to nothing more than a pledge of its credit and responsibility, and do not necessarily imply the existence of any funds or monies whatever. The transactions were in effect only an exchange of securities between the company and the parties dealing with it ; furnishing directly no funds to either, but supplying both with the means of raising them. In this point of view the company was precisely as much a borrower as it was a lender. And it would be utterly preposterous to call such a transaction a bona fide investment of the capital stock, funds, or monies, on bond and mortgage ; which the charter alone contemplates. But it is said life insurances were coupled with these transactions, and that the company was authorized to make such insurances. Admitting this to be so, it by no means follows that the bonds of the company which were the consideration of the bonds and mortgages of the dealers were valid. There is no necessary connection between the insurance and the loan, unless it can be shown that a lawful contract will give validity to an unlawful one, when both are made between the same parties at the same time. But the rule of law in such a case is, that where the considerations of the different contracts are so blended that they cannot be separated the invalidity of the one will of itself vitiate the other.

We infer from the evidence before us that the principal business of this company was to get its bonds and securities into circulation, with a view to raise funds ; and that this was usually done either through the medium of an exchange of securities with the dealers, or by a direct sale of the bonds, in the market, to purchasers, for cash. We consider this practice to have been in direct violation of the charter, wherein the company was prohibited from employing any part of its stock, funds or monies in the purchasing or discounting of any bill, bond, note, or obligation whatever, or in any other banking operations. If the business of banking consists essentially in issuing notes, making discounts, and receiving deposits, the operations of this company, in our opinion, bear so close a resemblance to

it as to come within the prohibition of the legislature, not only as expressed in the charter of the corporation, but as contained in the general restraining act.

It was urged before us, on behalf of the bond holders, that if the securities were void, still they were competent evidence of money had and received by the company to the use of those holders. This proposition we cannot admit. If the dealings in question were prohibited by the charter of the company and by the general restraining act, or by either of them, both the express and the implied contracts are alike null and void. To establish that the latter is valid while the former is void, would be opening a door to evade the force and policy of the law. The correct rule on the subject, and which is established by a great variety of cases, as we apprehend, is that all dealings and contracts in contravention of the spirit and policy of a statute are prohibited. We are therefore of the opinion that all the securities proved before us, commonly called life and fire bonds, are null and void, and furnish no evidence of any valid debt against the company.

We are aware that the views which we have adopted as to the invalidity of these bonds must operate with severity upon many innocent holders. But the decisive answer is, that dealers with the company, or in its securities, were bound to look to its authority to issue them ; and that in legal contemplation they did know, or were at least bound to know, that the company was transgressing its legitimate powers, and that its securities were liable to be set aside. Be this as it may, we feel ourselves imperatively bound to decide according to our convictions as to the law without regard to the hardships which it may produce in individual cases."

The Mercantile Insurance Company and Josiah Barker excepted to the report of the referees. But it was confirmed as to the other claimants; none of them having filed exceptions to the same within the eight days limited by the order nisi.

1842.

Attorney General
v.
Life and Fire Insurance Co,

*D. Selden,* for Barker and the Insurance Company.

*Murray Hoffman,* for the receivers.

THE CHANCELLOR. The Tradesmen's Bank filed no exceptions to the report of the referees, and it is therefore not necessary that I should examine the particular circumstances of the transaction by which that institution became the holders of some of the bonds of the Life and Fire Insurance Company, a few days before it stopped payment. I am satisfied however that the referees came to the correct conclusion that the bonds were not discounted by the bank for the benefit of the company, and that the money never was applied to its use ; but was appropriated, by Davis, to the fraudulent purchase of the Tradesmen's Bank, with the assent of the officers of that institution who authorized the discount of his notes. And that if the company or its effects were ever legally holden for the payment of these bonds, which I think was not the case, the liability was discharged by the release of Davis the principal debtor.

The referees have followed the decisions of the supreme court in holding that a corporation, without any express or implied power in its charter for that purpose, may make a negotiable promissory note, payable either at a future time, or upon demand, when not prohibited by law from doing so ; provided such note is in fact made or given for any of the legitimate purposes for which the company was incorporated. But they are right in supposing that the evidence before them was sufficient to establish the fact that the whole operations of the company in these bonds were for purposes not authorized by its charter, and in violation of the restraining acts of April, 1813, and of 1818. (*2 R. L. of* 1813, *p.* 234. *Laws of* 1818, *p.* 242.) It was an attempt on the part of those who had the control of the affairs of this company to carry on banking business, instead of the business for which they professedly obtained their charter. They in fact carried on the business of discounting notes, bonds and mortgages, and other securities for

money, giving in exchange therefor these bills or bonds, endorsed in blank by their own clerks and others, as negotiable securities, which were intended to be and actually were put in circulation as money ; in the same manner as the post notes of incorporated banks were issued and circulated as money before the issuing of such notes was prohibited by law. If the bonds or bills of a corporation thus issued and put in circulation are not absolutely void, in the hands of every person who may receive them, whatever may be their form, upon which question I express no opinion, there was sufficient on the face of these bonds to show that they were intended as a circulating medium, and were not given by the company to the payees thereof for an actual indebtedness in the course of the legitimate business of the company. At least there was sufficient to put those who received them upon enquiry as to the fact whether they were really given for any purpose within the authority of the corporation, and not in violation of the laws of the state. It may be proper also to say that although the fact was satisfactorily established that this company was for one or two years before its failure, in the summer of 1826, openly carrying on the business of issuing these bonds in violation of the provisions of its charter and contrary to law, the parties who have excepted to the report of the referees introduced no evidence to show that they received the bonds presented by them at their nominal amount, and for a bona fide consideration. And for aught that appears to the contrary, those parties may have received them from some of the officers or agents of the company, for purposes not authorized by its charter or by the laws of the state.

The report of the referees must therefore be confirmed, and the claims upon the bonds by the parties to the reference must be rejected by the receivers, in the distribution of the effects of the company among its creditors and stockholders.