Selden, J.
The first question presented by this case is, whether the city of Buffalo had power in December, 1853, to purchase land for the purpose of a market. It is now well settled that corporations, being merely artificial persons, derive all their powers from the law which creates them, or from some other positive statute. A natural person may do any act except such as the law forbids. An artificial person can do no act except such as the law authorizes. A corporation, however, is not limited to the ' exercise of the powers specifically granted, but possesses in addition all such powers as are either necessarily incident to those specified, or essential to the purposes and objects of its corporate existence.
*360 A municipal corporation, therefore, may at common law, unless restrained by some statute, purchase and hold all such real estate as may be necessary to the proper exercise of any power specifically conferred, or essential to those purposes of municipal government for which it was created. This principle of the common law is confirmed by our statute (1 R. S., 599, § 1), which declares that every corporation may “ hold, purchase and convey such real and personal estate as the purposes of the corporation shall require.”
The charter of the city of Buffalo does not, in express terms, authorize the common council to purchase real estate for a market. But it is contended : 1. That it is shown, by the common understanding and universal practice in this country, that the establishment of public markets, and the procuring of the necessary real estate for that purpose, is one of the duties which devolve upon the government of every municipal corporation; and 2. That the authority “ to establish” such markets being expressly conferred upon the city of Buffalo by its charter, the power to purchase a, site results as a necessary incident.
In the view I have taken of this case it does not become necessary to examine the first of these propositions. By § 6, title 3, of the city charter of Buffalo, in force when this purchase was made (Laws of 1843, 125), the common council were authorized to .make ordinances, rules and regulations for a great variety of purposes, and among others “to establish and regulate markets;” and the question is whether this power can be properly and effectually carried out according to the spirit and intent of the provision without the power to purchase the necessary ground for a market. Were the words “to regulate” the only* words here used, it is clear that the authority to purchase the ground could not be deduced from them. Those words naturally, if not necessarily, presuppose the existence of the thing to be regulated. Not so, however, with the words *361 “ to estab'ish.” Although these words may mean simply to confirm, yet their more common import is, permanently to create or found. In the connection in which they stand here, at least, this would seem to be their natural meaning, because otherwise they would add nothing to the power conferred by the words “to regulate.” It is one of the familiar rules for interpreting statutes, that they are to be so construed, if possible, as to give force and significance to every word. This rule can be observed, in this instance, only by referring the words “ to establish” to the act of originating, and the other words to that of subsequently regulating the markets. The words “ to regulate,” alone, would obviously comprise all that could be required to be done after the market was once created.
Assuming, then, as I think we may, that the words “ to ■ establish” mean to found originally, it may still be said that it does not follow that the power to purchase land is conferred, because markets may be. and frequently are established in cities and villages upon the lands of private individuals. This view, however, would leave it at the 'option of individuals whether any market should exist or not. If no one was willing to have a market upon his premises, the power of the common council to establish markets would be annulled. " But it is, I apprehend, a sound rule, that when power is given to a corporation to do an act, it has a right to do whatever is necessary to accomplish the act. This rule has its limitations, but it is unnecessary to recur to them here. A market is a public place for the sale of commodities. Without the power to procure a suitable place, the first step could not be taken towards the establishment or foundation of a market.- The' power to establish, therefore, must of necessity include that of procuring the requisite site. • It is not claimed on the part of the plaintiffs that the change from the statute of 1832 to that of 1843, in respect to the manner in which the power to establish markets is conferred, is of any *362 importance. In the former act the power is given in direct terms, while in the latter it is given only as part of the power to make 'by-laws, ordinances, &c. It does not appear to me that this change can materially affect the power. There must necessarily be some resolution, ordinance or regulation by which the common council expresses its determination to establish the market, forming the basis to which all the subsequent measures are referred.
It is urged, in opposition to the views which have been presented, that notwithstanding the charter of 1832 authorized the common council to establish markets, yet the power to purchase market grounds was expressly conferred by the act of 1835 (Laws of 1835, 95, § 4), and this is relied upon as a legislative construction of the previous act. But it will be seen that the main object of § 4 of the act of 1835 was to authorize the common council to borrow money upon the credit of the city, and that what is said as to purchasing market grounds is merely expressive of the purpose to which the money was to be appropriated. It was undoubtedly supposed, whether rightfully of not, that the power to borrow money could not be exercised without legislative authority. Similar acts have been passed in regard to other cities, whose charters contained the same authority to establish markets as that of Buffalo. By an act passed May 11, 1835, the city of Rochester was authorized to purchase “ a site for a new market,” but this provision was coupled with others conferring powers which required the interposition of the legislature; as, to levy money by tax to erect the market, the power to raise money by taxation being limited by the charter. So, also, a similar power “ to purchase a market lot or lots,” conferred upon the common council of the city of Rochester, by an act passed April 16th, 1836, was directly connected with a provision authorizing them “ to loan, on the credit of the corporation, a sum not exceeding fifteen thousand dollars,” &c. No inference can be safely drawn from these *363 and similar enactments in opposition to the construction here put upon the words “ to establish.” My conclusion, therefore, is, that the city of Buffalo had power to make the purchase in question.
But admitting that the city had a right to make the purchase, it is denied that it could purchase upon credit, and execute the bond given for the purchase money. The power of corporations in general to make contracts and incur debts in the prosecution of their legitimate business, and to give their promissory notes for such indebtedness, would seem to be firmly established, not only by universal practice, but by repeated judicial decision. (Mott v. Hicks, 1 Cow., 513; Moss v. Oakley, 2 Hill, 265; Kelly v. The Mayor of Brooklyn, 4 Hill, 263; Moss v. McCullough, 5 Hill, 131; Attorney-General v. Life and Fire Insurance Company, 9 Paige, 470; McCullough v. Moss, 5 Denio, 567.)
In the last of these cases the judgment was reversed, not on the ground that the corporation had not the power to contract the debt, or to give the promissory note, but for the reason that the property purchased was not required for the legitimate purposes of the company. Senator Lott, by whom the leading opinion was given, says: “ I am satisfied that the note in question was given for purposes and objects unauthorized by its charter, and, therefore, not obligatory.” It is true, the learned senator, in the course of his opinion, seems to intimate a doubt whether a corporation like that of the Rossie Lead Mining Company, instituted for specific business purposes, with a limited capital, can virtually add to that capital by the purchase of a large amount of property upon credit, especially where, as in that case, each stockholder is made individually liable for all the debts of the company.
However this may be, sound reason, no less than the authorities to which I have referred, forbid that it should be held that a corporation may not incur a debt in the exercise of its appropriate powers, or may not purchase, upon a *364 credit, property which is required for purposes authorized by its charter. Municipial corporations, especially, obtain their funds, for the most part, periodically, by means of annual taxation, and it is impossibe by any degree of care to adjust their means to their wants so accurately but that exigencies will arise, rendering necessary a resort to the credit of the corporation.
To deny to such corporations the power to use their credit in any case, would scarcely comport with the objects for which they are created. Under such a rule they could not procure materials for the repair of a bridge, unless the money had been raised in advance. The affairs of no municipal corporation were ever conducted, I presume, without incurring obligations, for various purposes, in anticipation of its revenues. It may be said that there is a distinction between incurring debts for the ordinary and current expenses of the corporation, to be defrayed by the expected annual income, and debts upon an extended credit, for objects of 'a permanent character, as, for instance, that a debt may be created for the repair of a bridge or market, but not for the erection of or procuring a suitable site for such market. I am unable to discover any solid basis for such a distinction, or any definite line by which it could be marked.
It is easy to see that it would be extremely difficult, if not impossible, to manage the affairs of a municipal corporation, without the power to contract upon its credit.» Every contract for labor, not paid'for in advance, is necessarily a contract upon credit, because the latroij, when once performed, cannot be recalled. It is otherwise in case of the purchase of property to be paid for on delivery, because, unless payment is made, it need not be delivered. Still, if it consist of several parcels, as of several loads of lumber or of stone, to be delivered at different times, and paid for when all are delivered; this is a contract upon credit for all except the last load. Were a corporation authorized ' *365 in general terms to build a bridge, without specification of manner or means, it would scarcely be doubted that it might contract with some person to furnish the materials and erect the bridge at a specific price, to be paid upon the completion of the job, and yet this would be to build the bridge entirely upon the credit of the corporation.
But it is useless to multiply arguments upon this point. ^ The power of a corporation to contract upon its credit cannot reasonably be denied; and if it may do so at all, there is, I think, no rule of law which limits the length of such credit. If a corporation may make an executory contract for property or services, it must of necessity have power to agree upon the mode and terms of payment; and to say that it cannot also agree as to the time of payment, /is to make a distinction which rests upon no sound principle, ' and is not warranted by any authority.
If, then, the city of Buffalo had power, under its charter, to purchase ground for a market, it had authority, so far as the charter is concerned, to do so upon a credit to which there was no limit but its own discretion, and the right to give the single bill in question would follow as a necessary consequence. Power to contract the debt must carry with it power to give a suitable acknowledgment of the indebtedness, in the form either of a promissory note or a single bill. I can conceive no well grounded rule which would concede one of these powers and deny the other, and no such distinction is warranted by the cases.
It maybe objected that the reasoning here adopted tends to establish the right of a corporation to contract a debt for any authorized purpose, by borrowing the money necessary to accomplish it; a right which, from the numerous legislative acts on the subject, it would seem corporations have not generally been supposed to possess. It is true the power to contract to pay A. $10,000 at the end of a year for doing certain work, and the power to borrow $10,000 of B., upon a credit of a year, for the purpose of paying *366 A. for doing the work, might seem, at first view, to be substantially identical. The amount is the same, and the time of payment the same; the creditor only is different.
A little examination, however, will show that there is a very material difference between the two. If the power of the corporation to use its credit is limited to contracting directly for the accomplishment of the object authorized by law, then the avails or consideration of the debt created cannot be diverted to any illegitimate purpose. The contract not only creates the fund, but secures its just appropriation. On the contrary, if the money may be borrowed, the corporation will be liable to repay it, although not a cent may ever be applied to the object for which it was avowedly obtained. It may be borrowed to build a market and appropriated to build a theatre, and yet the corporation would be responsible for the debt. The lender is in no way accountable for the use made of the money. It is plain, therefore, that if the policy of limiting the powers and expenditures of corporations to the objects contemplated by their charters is to be carried out, their right to incur debts for those objects must be strictly confined to contracts which tend to their direct accomplishment. If they may procure the requisite funds by the indirect method of borrowing, they may resort to any other indirect mode of obtaining them, such as establishing some profitable branch of trade, entering into commercial enterprises, &c., the avowed object being to obtain the means necessary to accomplish some authorized purpose. No one can fail to see that to concede to corporations the power to borrow money for any purpose, would be entirely subversive of the principle which would limit their operations to legitimate objects. Hence the distinction between such a power, and that of stipulating for a credit in a contract made for the . direct advancement of some authorized corporate object. It is true that the act to restrict and regulate the power of municipal corporations to borrow money, contract debts. *367 and loan tlieir credit, passed in 1853 (Laws of 1853, 1135), would seem to proceed upon the assumption that such corporations, independently of legislative restrictions, have the power to borrow money. This important question, however, is yet to be judicially settled, but as it is not involved in this case, I will not dwell longer upon it.
The only remaining question which it is necessary to notice is, whether the power to contract this debt is affected by the provisions of the act last referred to. No facts are shown to bring the case within the purview of § 3; but what is claimed is, that it is within the prohibition of § 5, which forbids the contracting, by a municipal corporation, of any “ funded debt,” except in the mode there pointed out by the statute. Is this, then, a “ funded debt ?” If we rely for a definition of these terms, either upon lexicographers or financial writers, it is clear that this is not a funded debt. The term “fund” was originally applied to a portion of the national revenue set apart or pledged to the payment of a particular debt. A “ funded debt,” therefore, was a debt for the payment of the principle or interest of which some fund *was appropriated. Bouvier says: “ Funded debt is that part of the national debt for which certain funds are appropriated towards the payment of the interest;” and this definition corresponds substantially with that given by all writers on the subject.
The term “ funding,” however, has been sometimes applied in this country to the process of collecting together a variety of outstanding debts against corporations, the principal of which was payable at short periods, and borrowing money upon the bonds or stocks of the corporation to pay them ofi"; the principal of such bonds or stocks being made payable at periods comparatively remote. But I am not aware that, even in common parlance, the term has ever been made use of to describe an ordinary debt, growing out of a transaction with one individual and represented by a single instrument, as in this case. I think *368 it is essential to the idea of a funded debt, even under the broadest use of that term, that the debt should be divided into parts or shares, represented by different instruments, so that such -parts or shares may be readily transferable. The act of 1835 contemplates three classes of debts. Of these, funded debts constitute one class, temporary loans another, and all other debts a third. How, the provisions of § 3 show that something more was intended to be included in the third class than debts for the ordinary annual expenses, otherwise it never would have permitted that class of debts to run up to five per cent of the whole “ aggregate valuation of the real estate of the city,” nor tc one-quarter of that amount. It must, therefore, have been intended to include all debts which were not in some legitimate sense “funded debts,” and I can conceive of no just and appropriate use of that term which would include the debt in question.
These views render it unnecessary to consider the question whether one or more of the tax payers of a city can' maintain a suit brought to restrain the municipal authorities in the exercise of their corporate powers.
The judgment of the supreme court should be affirmed, With costs.
Wright, J.
Styling themselves tax payers, the plaintiffs, in March, 1854, commenced an action against the city of Buffalo and the defendant Austin, praying that the common council be enjoined from making or leyying any tax or assessment for the payment of the interest due or to grow due on a city obligation, issued to Austin, on the purchase of real estate for the purposes of a public market. In December, 1853, the common council adopted a resolution to purchase two city lots from Austin, for market grounds, at the price of $35,000. The land was conveyed to. the city, in pursuance of the resolution, on the twenty-sixth of December, and on the day following the mayor and *369 comptroller issued and delivered to Austin a certificate or acknowledgment, under the corporate seal, that the city of Buffalo owed to the bearer the sum of $35,000, bearing interest at the rate of seven per cent per annum, payable semi-annually, at the comptroller’s office, and the principal reimbursable at the same place on the 27th of December, 1878. Indorsed on the instrument was a stipulation that it was delivered to Austin upon the condition of being optional with the city to pay the amount thereof in cash at any time within one year from its date, with interest. Before the 1st of March, 1854, the comptroller presented to the common council a statement in detail of the several sums which would be required to meet the expenses of the year 1854, for all city purposes. In such statement he estimated and included a sum sufficient to pay the interest for a year and a half on the bond or certificate issued to Austin. On the twenty-third of March, the common council, by resolution,, adopted the statement of the comptroller so far as to include such interest as a part of the general tax to be levied in 1854. At this juncture the plaintiffs interpose, and ask that the common council be enjoined from finally confirming the statement and including the interest, or levying any tax or assessment for the payment of the bond, or the interest thereon, or any part thereof. They further demand that Austin’s conveyance to the city of Buffalo may be adjudged void; that the city be decreed to have taken no right or title, under the deed, to the premises therein described; that it be decreed to reconvey the premises upon the surrender by Austin of the bond to be canceled; that the bond be declared null and void, and Austin directed to surrender it up to be canceled; and that the city be perpetually enjoined from paying the bond, or any part thereof, or the interest thereon, and from levying any tax on the taxable property of the city for such purpose. Prior to the commencement of the action, Austin had sold and transferred the obligation for a valuable consideration.
*370 The right of the plaintiffs to maintain the action is a question, arising preliminarily, of no slight importance. It is important, not so much for the amount at stake in the present controversy, as to know whether, at the instance of any corporator or tax payer whc may consider himself aggrieved, the exercise of the governmental powrer of a municipal corporation can be restrained, and its legislative discretion made to conform to the judicial discretion. The exercise of judicial power, at the suggestion of private persons, to control the governmental power and legislative functions of even a municipal government, it is believed, is of recent origin. It has been thought, heretofore, that a corporator could not implead the corporation in a court of law or equity for alleged abuses of legislative discretion, or even a usurpation of power by that branch of the local government clothed with legislative functions; but that if there had been an abuse of a public trust, or a misuser of the corporate powers affecting the public, only the state, at the instance of the attorney-general, could interfere to correct the existing or threatened evils. It has also been supposed that the power lodged with the corporators, to frequently change their municipal rulers, is usually an adequate protection against the evils of usurped power or violations of public trust; but that a private action may be maintained for the redress of a public wrong, or that an individual corporator, sustaining no injury not common to all, may maintain a suit against a municipal corporation for a violation of its public duties, is certainly novel.
The Code defines g,n action to be an ordinary proceeding in a court of justice, by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offence. (Code, § 2.) Actions are of two kinds, civil and criminal. They are also public and private. (§ 3.) A private action may be maintained for the enforcement or protection of a private or individual right, or the redress or *371 prevention of a wrong done or threatened to a person in his individual character. To maintain it, it must appear that some personal right has been or is about to be invaded, or that the party is entitled to have such right enforced or protected in a court of justice. The suitor must make title in a private capacity to the relief demanded. A public action can only be prosecuted by the people of the state, as a party, and it may be criminally, against a person charged with a public offence, for the punishment thereof; or, civilly, against corporations or natural persons, for the usurpation of franchises or any part of the sovereign power not delegated to them, or the misuser or non-user of corporate power, or breaches of public trust, or violations of public duty. Violations of public trusts by corporations or public bodies may, I have no doubt, be restrained and corrected by equitable action prosecuted by the state.
The plaintiffs claim the right to maintain this action for the reason that they are owners of real estate subject to taxation, and are each, of them tax payers in the city of Buffalo to an amount exceeding $100 annually, and that an attempt to collect the tax to pay the interest in question would lead to and cause a multiplicity of suits. The only title made to the relief demanded is, that should the common council be allowed to assess and levy a tax to pay the interest of an indebtedness for city purposes illegally contracted, as is alleged, they, in common with all other tax payers of the city, may be subjected to'the payment of an infinitesimal part of such tax. They complain of the invasion of no private right. They ask not the enforcement or protection of such a right, nor the redress or prevention of a wrong done or threatened to them as private persons in their individual character. They complain that a great public wrong has been done. Their municipal government has been unfaithful in .the discharge of the public trusts confided to it. It has usurped and exercised powers neither in terms or by implication granted by the sovereign autho *372 rity. It has, without authority, purchased grounds on which to erect a public market, and incurred a city debt, having a quarter of a century to run, as the consideration of such purchase; and they, as corporators, demand the aid of the judicial arm of the state to redress the public wrong. It may be that the courts would restrain and correct such a violation of public trust or excess of authority, on the part of a public municipal body, in an equitable action prosecuted by the state; but it seems quite clear the only remedy to be exerted by the corporators, as such, is to remove, when opportunity presents, the unfaithful incumbents of governmental power. They can make no case of private injury to be redressed, or private right to be enforced or protected. Any right they have is as the members or constituency of a local government, and which is common to all, and the wrong to be redressed is of a public nature, exclusively pertaining to a public duty. The parties to an action must show that they are entitled to the relief demanded, or some part thereof, or the complaint will he dismissed. It is not enough to show that the action might have been maintained by other parties. For this reason, the complaint was properly dismissed at the special term.
If, however, the questions of power involved are open for judicial determination in an action prosecuted by the plaintiffs, the judgment should be affirmed. The whole complaint is, that the city of Buffalo has purchased grounds on which to erect a public market, and contracted a debt for the purpose. In this state, the right is expressly conferred by statute on corporations to purchase, take and hold such real estate as the purposes of the corporation may require, and as is necessary to enable it properly to exercise its powers and discharge its duties. (1 R. S., 599, § 1, sub. 4.) This general power was, in terms, conferred on the city of Buffalo in the consolidated-and amended charter of 1843, and which was in force at the time of the act complained of. (Laws of 1843, 116.) By the original charter *373 the corporation was authorized to take, hold, purchase and convey such real and personal estate as the purposes of the corporation might require; and the common council were empowered to establish and regulate a market or markets in the city. (Laws of 1832, 297, §§ 2, 50.) This latter power was not abrogated by the charter of 1843, as there was no provision in the last named statute inconsistent with or repugnant to it. (Laws of 1843, ch. 132, tit. 10, § 5.) Indeed, by the charter of 1843, the same power is recognized. Having the general authority to purchase, hold and take real estate, as the purposes of the corporation shall require, the common council is further authorized to make ordinances, by-laws and regulations for various purposes, amongst others to establish markets. (Laws of 1843, ch. 132, tit. 3, § 6, sub. 4.) It is not necessary to take the ground that, without express grant, the establishment of public markets is not only within the powers, but also one of the duties of municipal corporations, as the power is conferred on the city government of Buffalo in express terms. But it is urged that the power granted to establish markets does not include the power to purchase market grounds and erect market buildings thereon. If it does not, it is difficult to perceive what the common council has to do in the establishment of a market. Is it to merely regulate the sale of meats, fish and vegetables, and become butchers ? Certainly not, for these powers are expressly granted in the original and amended charters. Is it simply to designate a place where a public market only shall be held ? I think not. Besides the impracticability of any efficient exercise of such a power, it is against the uniform construction of a similar grant in the municipal charters of the state. Tile authority “ to establish and regulate markets ” has been uniformly regarded by the municipal corporations of the state on which it has been conferred as empowering them to purchase or lease market grounds, as one step in a series of acts resulting in the establishment of a public market. In *374 the exercise of the power, real estate has been purchased or leased and market buildings erected; and this, it is believed, is the first instance in which the power to take and hold real estate for the purpose has been questioned. The common council could not establish a market in the public streets, as this would be a nuisance. It could not do it upon private property without the grant, leave or license of the owner. Procuring a site for the purpose is, therefore, one of the first steps toward its establishment; nay, it is a necessary step in the exercise of the power. Having the power, by express grant, to establish a market, it is one of the purposes for which the municipal corporation exists, and it is clothed with the powers necessary to carry into effect that expressly granted. It is claimed that a legislative construction has been given to the words “ establish a market,” inasmuch as the original and amended charters contained this grant of power; yet the express power to purchase lands by the city for a public market was given in a special act, passed in 1835, and that whenever power lias been exercised in the purchasing of property it has been under special grants. But the provision in the act of 1835 in relation to the purchase of market grounds is not to be regarded as a legislative construction of the extent of the power embraced in the grant to establish markets. It has been the invariable practice of the legislature, when authority has been given by statute to cities to borrow money, to specify the object for which the money is to be appropriated. The instances in which the legislature.has granted special powers to cities to purchase lands for markets furnish no argument against an exercise of the power in this case, inasmuch as those special acts of legislation are connected with the power to borrow money, which constitutes the principal object of the enactment. This was so with regard to the act of 1835. There the main purpose of the enactment was to authorize the borrowing of monéy on the credit of the city, part of which was to be expended in the pur *375 chase of market grounds and the erection of suitable buildings thereon, and another part to erect a hospital building. The section authorized the loan by the city, the levying of taxes to reimburse it, and designated the purposes for which the money was to be borrowed. (Laws of 1835, 95, § 4.)
I think it must be conceded that the city had power to purchase ground for a public market. If so, there is nothing in the charter or general law of the state forbidding the purchase to be made on credit. It has never been doubted that a municipal corporation may become a debtor for property which it is authorized to acquire. Whether the credit be long or short is not a question of power, but of discretion on the part of the corporation; and the parties may contract on that subject as they shall deem proper. A corporation authorized to do an act has, in respect to it, the power to make all contracts that natural persons could make. In Brady v. The City of Brooklyn (1 Barb., 584), it was held that corporations have all the powers of ordinary persons, as respects their contracts, except where they are expressly, or by necessary implication, restricted. In Beers v. The Phoenix Glass Company (14 Barb., 358), it was decided that the corporation possessed the incidental power to borrow money for the appropriate business of the corporation, and give its notes. So, also, it may exercise the incidental power of renewing notes taken in payment of debts. (New-York Fire Ins. Co. v. Sturges, 2 Cow., 664.) Though prohibited from engaging in banking operations, it may make a valid negotiable promissory note in payment of its debts, and it will be presumed valid until the contrary appears. (Barker v. Mechanics’ Fire Ins. Co., 3 Wend., 94.) Under its general powers, a municipal corporation may give a bond for muskets, and a suit on the bond will be sustained. (State of New-York v. City of Buffalo, 2 Hill, 434.) A corporation may issue negotiable paper in payment of a debt, and no provision in its charter or elsewhere merely directing a certain form in affirmative words, should be *376 construed as taking away this power. (Kelley v. The City of Brooklyn, 4 Hill, 263.) In Barry v. The Merchants’ Exchange Company (1 Sandf. Ch. R., 280), the corporation had given its bonds, payable in ten years, to raise money to build with, it being authorized to buy land and erect buildings thereon for a public exchange. It was held that the issuing of the bonds was within the power of the corporation, and their validity sustained. In short, as was.said in Halstead v. The City of New-York (5 Barb., 218), “it has long been settled in this state that a corporation may, without any express power, give its note or bill of exchange, when not prohibited by law, for a debt contracted in its legitimate business.” Having the power to purchase the land for market grounds, in furtherance of the legal purpose the city of Buffalo could incur the debt in question, and make and deliver the evidence of its indebtedness. That the legislature has repeatedly, by special enactments, given the power to issue bonds for specified objects, is no legislative construction adverse to the doctrine of a general power to incur a debt for an authorized purpose, and make and deliver the evidence of it. Nor is the power affected by the act of 1853, entitled “An act to restrict and regulate the power of municipal corporations to borrow money, contract debts and loan their credit.” (Laws of 1853, ch. 603.) The intent of this act was to restrict municipal corporations in a prodigal loan of their credit to aid individual or incorporated bodies; to limit the extent of the acknowledged power to contract debts for municipal purposes; to restrain the borrowing of money on temporary loan ; and to provide against the contracting of a funded debt, unless it be for a specific object, expressly stated in the ordinance proposing the same, which ordinance w.as to be adopted by a two-third vote of the common council, and submitted to and approved by a majority of the tax payers of the city or village, at a special election appointed for that purpose; nor unless the legislature should, by law, have ratified such *377 ordinance, and provided for levying and collecting annually a tax sufficient to pay the interest accruing upon the debt, and also five per cent of the principal, which latter sum was to constitute a sinking fund for the redemption of the debt. The 3d section provided that a municipal corporation should not contract any debt, the amount of which should, exclusive of the debt owing by the corporation, exceed at any time a sum equal to five per cent, nor, inclusive of such debt, should the same exceed eight per cent of the aggregate valuation of the real estate within its bounds, to be ascertained by the last corrected valuations of the assessors of such corporation. This is the only séction of the act describing, or applicable to, a debt of the character in question; and there is no pretence that this debt raises the indebtedness of the city of Buffalo to a sum equal to five per cent on the aggregate valuation of the real estate within its limits. But the plaintiffs urge that the corporation was expressly prohibited by the act from contracting a debt, or issuing any evidence of indebtedness, except in the form and manner and as authorized by the 5th section, the substance of which has been cited; that the terms “loan” and “funded debt” are treated as identical; that the debt in question is a funded debt, and, therefore, falls within the 5th section. If this position be correct, as. was well remarked by the counsel for the defendants, then all the previous provisions of the act of 1853 are rendered useless and senseless. If this be a funded debt, then all debts owing by municipal corporations are funded debts; and as a debt to be created under the 5th section, and there styled a funded debt, involves express legislative sanction of the specific debt, the debt thus sanctioned would be valid, whether in accordance with the previous sections of the act or not. The act itself, consequently, repudiates this construction. Besides, it can scarcely be pretended that the legislature meant to restrict a municipal corporation from *378 becoming a debtor for property which it was authorized to acquire, or for services which it had' a right to procure, unless the credit was first sanctioned by the municipal tax payers and the legislature, and a fund provided for the payment of the interest and the sinking of the principal. Yet the position of the plaintiffs, that all debts created by a corporation are funded debts within the scope and meaning of the act, leads to this conclusion. The legislature has not regarded the 5th section as applicable to any other description of debt than such as is strictly a funded debt, for it has repeatedly authorized municipal corporations, since the act of 1853, to borrow money and give bonds -for its payment, with interest, at a long period, without a compliance with the formalities prescribed in the 5th section, and without expressing any intention to repeal or amend that section.. (Laws of 1854,145, § 12; id,., 150, 163, 266, 316.) The statute expression is, “ No funded debt shall be contracted,” &c. The debt created by the purchase of the market grounds was not, in any sense of the expression, a “funded debt,” nor is it apparent that in the use of the term the legislature intended to include any permanent debt payable on time, with interest, whether for money borrowed or otherwise. We are rather to understand the expression to have been used in the sense and indicating the meaning in which it had been previously and ordinarily used and understood by legislators and the commercial world. A “ funded debt” has a well defined signification. The funding of a debt is the pledging of a specific fund to keep down the interest and ultimately discharge the principal. (1 Bouv. L. Dic., 551; 1 McCullough's Com. Dic., 689; 1 Ency. Am., 337.) The benefits arising from a funded debt differ materially from the ordinary obligations of a state or corporation to pay money. In the latter case there need be no pledge or collateral security for payment. But a funded debt rests on some pledge of the public or corporate revenue or property. *379 which is set apart as a fund to keep down the interest and extinguish the principal of the debt. When the extinguishment of the debt is contemplated it is called a sinking fund, and it is so denominated in the act of 1853. The funding system is resorted to for the improvement of public or corporate credit, by giving creditors a specific lien either upon revenues or property. It is, in effect, a mortgage. The 3d section of the act of 1853 limits the whole amount of debt which a municipal corporation may owe. The 5th section relates to another subject, and regulates the manner of contracting a particular description of debt, viz., a “ funded debt.” Though the expression, funding a debt, has been sometimes incorrectly used to signify the aggregating of numerous floating debts of a municipal corporation, created at different times and upon different considerations, •and borrowing money upon bond to pay off the whole, yet even that use of the expression does not embrace this case, [n those instances the law contains what may be denominated a funding clause or section, imposing an obligation upon the corporation to raise by tax the amount, as therein directed, to pay the interest and principal -of the loan. (Laws of 1850, 385; id., 3852; 421, §§ 1, 2; id., 1854, 150, 316.) This transaction, therefore, is not affected by the act of 1853. The corporation was not expressly prohibited by law from contracting a debt in the discharge of an authorized duty, or from making and issuing the evidence of such indebtedness ; and, there being no express legal prohibition, its acts are valid and obligatory upon it.
Independently, then, of what I deem a fatal preliminary point, viz., tire absence of right by the plaintiffs, as munici'pal corporators and tax payers, to maintain the action, on the merits the judgment should be affirmed.
All the judges, except Denio, C. J., who did not vote, concurred that the judgment should be affirmed on the *380 merits; but the court expressed no opinion as to the plaintiffs’ right to maintain an action to restrain the corporation in the exercise of its corporate powers.
Judgment affirmed.