The question is again raised in this case, whether associations, under the general banking law of 1838, are subject to the provisions of the act "to prevent the insolvency of money corporations." (1 R.S., 589.) This point has been directly passed up by this court, in the cases of Gillett v. Moody (3Comst., 479); Talmage v. Pell (3 Seld., 328); andGillett v. Phillips (3 Kern., 114).
It is indispensable to the due administration of justice, especially by a court of last resort, that a point once deliberately examined and decided, be considered as settled, and closed to farther argument. The counsel for the respondents suggest, as reasons for considering this as an open question, that in the cases of Gillett v. Moody, and Gillett v.Phillips, all serious argument of this point was by collusion intentionally omitted; and that, in Talmage v. Pell, Judge GARDINER, without whose concurrence the resolution on this subject could not have been adopted, appears, from his own admission, not to have examined this question.
These reasons are, I think, without weight. The first is wholly unsustained by evidence, and the last derives no support from the case of Talmage v. Pell, as reported. Although Judge GARDINER says, at the close of his opinion, that, independently of the questions raised under the act to prevent the insolvency of moneyed corporations, the decree of the Supreme Court should be reversed, he had, nevertheless, previously come to the conclusion that banking companies, formed under the law of 1838, were moneyed corporations, within the provisions of that act. The decision was evidently put in the explicit and imposing form of a resolution, for the purpose of settling definitely this vexed question; and it is not to be supposed that Judge GARDINER united with his associates in such a resolution, without a due consideration of the point. *Page 248 
One of the learned justices, by whom this cause was heard in the Supreme Court, has deemed it decorous and proper to recur to the question, whether banking companies, formed under the law of 1838, are corporations at all, and to present an elaborate argument upon a point which has been, over and over again, adjudicated by the Supreme Court and Court of Errors, as well as by this court. I perceive nothing in the logic of the learned justice of sufficient force to overthrow these repeated decisions. It is mainly a reproduction of the arguments so often pressed upon the courts, when this question was under discussion, the staple of which consists in the fact that banking companies, under the law of 1838, are called in that law, and in several subsequent statutes, "associations" and not corporations. The learned justice adopts the notion, that the legislature can create an artificial being with all the attributes of a corporation, without its becoming such; and sees no legal distinction between a body of stockholders, authorized to have perpetual succession, to sue and be sued by a common name, and responsible upon their contracts only to the extent of their common property, and a partnership, the ostensible and known managers of which are personally liable, to the whole extent of their private as well as partnership property, for every debt. I cannot concur with the learned justice in these views. But I will not enter here into any discussion of the question. Unless we are to abandon all judicial landmarks, and to throw any and every point open for discussion, however often it may have been decided, we must hold, not only that the banking companies formed under the general banking law are corporations, but that they are within the purview of the act "to prevent the insolvency of moneyed corporations," and that where, as in this case, their affairs are managed by a board of directors, they are subject to the provisions of section eight of that act. That section provides that "no conveyance, assignment or transfer, not authorized by a previous resolution of its board of *Page 249 
directors, shall be made by any such (i.e., moneyed) corporation of any of its real estate, or of any of its effects, exceeding the value of one thousand dollars."
Were the trust deeds in question in this case executed in accordance with this provision? The only previous resolution of the board of directors, authorizing the execution of any such deed, was that of January 6, 1840, which authorized an assignment of bonds and mortgages, in trust, to Joseph D. Beers, Daniel E. Tylee and John L. Graham. This resolution is relied upon as an authority for the assignment made to Blatchford, Curtis and Graham. Without looking farther for discrepancies between the trust created and that authorized by this resolution, I have no hesitation in saying that a resolution, authorizing a conveyance in trust to three individuals by name, could not, by possibility, be construed to authorize a conveyance to one of the three, together with two others not named. Even if the trust was merely passive and nominal, it could hardly be said that a trustee could be substituted for the one selected. But here the trustees have important and responsible duties to perform. The large fund conveyed to them is placed in a great degree under their control. They are authorized to borrow money upon it, as well as to collect and reinvest the sums due. If Blatchford and Curtis could be substituted for Beers and Tylee, so might two individuals not possessing a tithe of their acknowledged capacity and responsibility. In my judgment, no such substitution could be made.
It is, I think, equally clear that no subsequent ratification of the conveyance, by resolution or otherwise, could uphold the trust. The word previous, in the statute referred to, is a significant word. It is there for some purpose. To suppose that a subsequent resolution will legalize a trust previously made, is to leave this word wholly without force or meaning. This would not only conflict with all general rules for interpreting statutes, but would do violence to the plain meaning of the legislature in this particular instance. *Page 250 
The word could not have been used by accident. It has a sensible object, which is, to secure the free and unbiassed assent of the directors or managers of a corporation to any considerable transfer of its effects, unembarrassed by any previous action on the part of its executive officers.
It is unnecessary to cite authorities to show that every statutory power, especially when it relates to the transfer of property, must be strictly pursued, and that every regulation in regard to it must be rigidly observed, even where no reason can be seen for the requirement. The position, that the committee of investments and finance could authorize the trust, is clearly untenable. It will not be doubted that the directors could do it, because they were the managers of the corporation, and come within the very terms of the statute. Did the power then rest in two independent bodies? If so, suppose their action should conflict, which would prevail? It was not a power which could be delegated, but one which must rest where the statute placed it. The committee of investments and finance might have been clothed with the power by making them the general managers of the corporation. But it is not pretended that this was done.
The trust, therefore, was clearly defective for want of a previous resolution; and the question arises, whether the house of Palmer, Dent Co., and the other holders of paper intended to be secured by the trust deeds, are to be regarded as purchasers "for a valuable consideration without notice," within the last clause of the section we are considering. It is not claimed, on the part of the receiver, that the Palmers had themselves any actual knowledge of the want of a previous resolution authorizing the trust, but it is insisted that they are not entitled to the protection of the statute as bona fide purchasers, for the reasons: First. That neither they nor the trustees have put themselves upon that ground in their answers; Second. That the saving clause in question does not apply to those who take directly from the corporation, but only to subsequent purchasers: Third. That the *Page 251 
trustees paid no consideration for the conveyance; Fourth. That Graham, one of the trustees, being a director of the bank, was of course chargeable in law with knowledge of the want of a resolution; and that notice to him was, in legal effect, notice to all the trustees.
The first of these points appears to be well taken. The answers allege, in substance, that the requirements of the statute were complied with; and the rule is clear that the proofs must correspond with the allegations. This is not a case, as claimed by the respondents' counsel, where the receiver was bound to negative the fact that the respondents were bona fide
purchasers. The clause in question is not incorporated into and made a part of the main provision, but is, in substance, a proviso. The rule relied upon, however, by the receiver's counsel, is purely technical, and ought not, in a case like the present, to be suffered, if it can be avoided, to prevent the attainment of substantial justice. As no possible wrong could be done by allowing an amendment of the pleadings in this respect, this might, perhaps, be permitted. But it will, in my judgment, be found unnecessary to determine this question.
The position that the last clause of section eight applies only to such purchasers as do not take directly from the corporation, although supported by reasoning of some force, is nevertheless inconsistent with the structure and language of the section. It provides, first, that "no conveyance, assignment or transfer,c., shall be made," and then, that this provision shall not "be construed to render void any conveyance, assignment or transfer in the hands of a purchaser for a valuable consideration," c. Now, if the last clause is intended to refer to the same conveyance, assignment and transfer as the first, and if by conveyance, assignment, c., it means the instrument as well as the title, as I think it must, then the interpretation of the section is clear; because the conveyance, assignment or transfer which it forbids, would of course be "in the hands" of the first purchaser. All *Page 252 
subsequent purchasers must claim by some other conveyance. Can there be a doubt that the last clause refers to the same conveyances which the first prohibits? It would seem that the same words, following in the same sentence, must mean the same thing.
If, however, any doubt could exist as to the construction of section eight, taken by itself, it would be entirely removed by the next section, which commences with the words, "No such conveyances," c. If the words, "conveyances, assignment or transfer," in the last clause of section eight, refer only to conveyances, not from the corporation itself, but from its assignees, then section nine, upon every rule of construction, must refer to the same, thus rendering the provision absurd. This shows, what indeed is sufficiently clear without it, that the conveyances mentioned in the prohibitory and saving clauses of section eight, and in the commencement of section nine, are all the same; and consequently that the purchasers intended to be protected by such saving clause are, or at least may be, those holding conveyances directly from the corporation. The provision was evidently aimed at fraudulent combinations between the officers of a corporation and those taking conveyances from them. (3 R.S., 530, 2d ed., revisor's note.)
The next answer given to the claim of the respondents to be considered as bona fide purchasers, is, that the trustees paid no consideration for the assignment to them. This position assumes that the court, in giving effect to the statute can only regard the legal and not the equitable title. I cannot adopt this conclusion. The title of the trustees is in a great degree merely formal. The real purchasers are the cestuis que trust. Although not, perhaps, within the strict letter of the exception, they are clearly within its equity. The exception itself recognizes and is in fact based upon the idea of establishing an equitable in opposition to a legal title, and it would be singular if, in construing such a provision, equitable rights were not to be regarded. *Page 253 
The last reason given for denying to the cestuis que trust
the benefit of the saving clause is, that one of the trustees had notice of the defect in the trust deeds. This objection proceeds upon the ground that the familiar rule which charges a principal with notice of any facts which may come to the knowledge of his agent, in the course of his employment, is applicable to this case. This rule, however, can hardly apply where the agent was not selected by the party sought to be charged with, but by the party seeking to avail himself of the constructive notice. The receiver, in his cross bill, alleges that the respondents selected two of the trustees, viz., Blatchford and Curtis, but admits that Graham was selected by the corporation. But the rule cannot apply for another reason. The trustees were as much the agents of the corporation, for which they were to perform important duties, as of the purchasers of the securities. The corporation, therefore, upon the same rule, is chargeable with constructive notice that their trustee, Graham, had not in fact communicated to the cestuis que trust the want of a previous resolution. Is the coporation, then, in a situation to avail itself of the principle? I think not. But for the omission, therefore, of the necessary averment in the answers, the respondents, the Palmers, and all other holders of securities under the trust, would be protected by the saving clause in section eight, against the defect arising from the want of a previous resolution authorizing the execution of the trust deeds.
I shall pass over the question raised under section nine of the same act, which prohibits, under certain circumstances. the giving of preferences; and the question also, whether the trusts are void, because made to hinder, delay or defraud creditors; as well as the various points made upon the internal structure of the trust deeds, because the view I have taken of other parts of the case renders it unnecessary to consider them.
In regard to the usury alleged the receiver cannot, I think, avail himself of it as a defence. The act of 1850, provides *Page 254 
that no corporation shall hereafter interpose the defence of usury, in any case. (Session Laws 1850, ch. 172, § 1.) There can be no doubt that this statute operates upon defences existing at the time it was passed. The word "hereafter' plainly refers to the time when the defence is interposed, and not that when it accrued. Usury being a mere statutory defence, not founded upon any common law right, either legal or equitable, it was clearly within the power of the legislature to take it away, So far as the receiver represents the corporation, he is of course bound by this act. But it is said that he also represents creditors, and has, therefore, rights which the corporation itself would not have. It is true that he may be said in some sense to represent creditors. It is only their equitable rights, however, which he represents, and usury can hardly be called an equitable defence; although, while it exists in full force, it is doubtless available in equity as well as at law. If there are cases in which the creditors of a borrower may set up the usury, when the borrower himself would be precluded from doing so, it can only be where the creditor alleges usury in his own name and right, and not where he is forced to make the allegation through the borrower or his representative. Admitting that the receiver represents, in some deeree, the equitable rights of creditors, he is still primarily the representative of the corporation. He succeeds to and asserts its rights; his acts are its acts, his allegations its allegations. How then can he plead what the corporation could not plead? The defence, if interposed, is not for the sole benefit of the creditor. The corporation may or may not prove insolvent. If the receiver succeeds it is not insolvent. Can the defence be set up for the partial or contingent benefit of the corporation? Clearly not.
It may be said that the statute only prevents corporations from availing themselves of usury as a defence, but does not prevent them from commencing a suit to obtain affirmative relief against a usurious contract. It will, however, be *Page 255 
found unnecessary to consider this distinction; because, if sound, it would not materially vary the result to which I have arrived, as no affirmative relief could be given except upon repayment of the sum actually loaned. It is urged, that the defence in this case having been actually interposed before the act of 1850 was passed, the statute does not apply. But to put this construction upon the act would, I think, be a mere evasion. Its intention obviously was to take away altogether from corporations the defence of usury. Proving usury upon the trial, or setting it up at the hearing, is interposing it as a defence no less than the pleading of it.
We come then to the questions: First. Whether, in issuing the paper under which the respondents claim, viz., the bills of exchange, the so-called mortgage bonds, the debentures, and the certificates of deposit, or either of them, the banking company exceeded its powers? And second. If it did, what are the consequences? The receiver's counsel takes the broad ground, that banking corporations cannot borrow money, or, at least, that they cannot borrow to supply the place of capital. They contend that it is the business of banks to lend money, not to borrow; that borrowing does not come within the scope of legitimate banking, and is in its nature a power which corporations created for banking purposes cannot properly exercise. This position is not supported by any direct authority; and a careful consideration of the nature of banking, together with an examination of its history, has satisfied me that it cannot be sustained. It is not in harmony with the present practice or the past history of banks. Banking for profit is based primarily upon the idea of borrowing, without interest, the various sums which the individuals of a commercial community must necessarily keep on hand unemployed, to meet any sudden emergency, and reloaning the money or the greater part of it upon interest. It may be said that banks may borrow, that is, receive deposits without interest, but cannot borrow upon interest. This, too, is untenable. One of *Page 256 
the soundest banking systems known to the age, viz., the Scotch, is sustained to a great extent by sums borrowed at a rate of interest below that charged by the banks. (Edin. Ency., 224,tit. Banks; Lawson's Hist. of Banking, 419.) The committee appointed by the House of Lords in England, in 1826, to inquire into the Irish and Scotch systems of banking, reported that it was "proved by evidence and by the documents, that the banks of Scotland, whether chartered joint-stock companies or private establishments, have, for more than a century, exhibited a stability which the committee believe unexampled in the history of banking." (Lawson's Hist. of Banking, 434.) The country bankers of England also allow interest on the balances of money in their hands. (McCulloch's notes to Smith's Wealth ofNations, 489, title Money, Edin. ed.; Lawson's Hist. ofBanking, 273.) Another writer, speaking of the practice of borrowing by the Scotch banks, says: "This is in fact a part of the proper business of a bank. A banker is a dealer in capital, an intermediate party between the borrower and the lender; he borrows of one party, and lends to another, and the difference between the terms at which he borrows and those at which he lends is the source of his profit." (Gilbert on Banking, 52.) It can scarcely be said, in view of these precedents and authorities, that borrowing money, even to be used as capital, is not within the range of the business of banking. The position, therefore, that the acts of the banking company in issuing the paper in question, were ultra vires, cannot be sustained on the ground that borrowing is no part of legitimate banking, but must rest on that branch of the argument which is drawn from the terms of the general banking law itself. It is a question, not of appropriate banking, but of corporate power.
Corporations are purely artificial beings. They have no existence independent of the act which creates them, and can therefore have no powers except such as that act confers. An enabling statute, enacted in reference to a natural person, *Page 257 
simply superadds a power to those already possessed. It acts in combination with the natural rights of the individual; and courts, in determining the extent of the power, must necessarily take into consideration all the rights and powers which belong to the individual independently of the statute. The authority conferred is the complex result of the legislative act taken in connection with the preëxisting rights. Substantially the same is true, in case of a supplementary act, granting additional powers to an existing corporation. But in construing the original organic act, the inquiry is much narrower and more simple. The charter of a corporation is the sole source of its existence, and it can, legitimately, no more exercise powers not deducible from such charter, than man can exercise powers denied to him by nature. Although this is apparently self-evident, I will refer to one or two authorities, simply to show the clearness and force with which the doctrine has been judicially expressed. In Head
v. The Providence Insurance Co. (2 Cranch., 127, 169), Chief Justice MARSHALL, speaking of the exercise of corporate powers, says: "An individual has an original capacity to contract and bind himself in such manner as he pleases. * * * * But with those bodies which have only a legal existence, it is otherwise. The act of incorporation is to them an enabling act; it gives them all the power they possess." In Dartmouth College v. Woodward
(4 Wheat., 518), the same eminent judge says: "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence." Chief Justice HOSMER, of Connecticut, asserts the same doctrine in the cases of the N.Y. Fire Insurance Co. v.Ely (5 Conn., 560), and Berlin v. New Britain (9 id.,
175). In the latter case he says: "The powers of a corporation, an artificial person, are such, and such only, as its charter confers. It may act in the *Page 258 
manner and for the purposes prescribed, but beyond this limit it cannot go." Similar language was held by Chief Justice THOMPSON, in the case of The People v. The Utica Insurance Co. (15John., 383). Speaking of the powers of the corporation, he says: "Such an incorporated company have no rights, except such as are specially granted, and those that are necessary to carry into effect the powers so granted."
It is plain, therefore, that our statute (1 R.S., 600, § 3), which forbids the exercise, by corporations, of any powers except such as are expressly given by their charters, or such as shall be necessary to the exercise of those so given, is simply declaratory of a preëxisting rule of the common law. The rule being a necessary deduction from the very nature of a corporation as an artificial being, it follows that it is applicable to every corporation, whether created by special charter or by general law, whatever may be the objects or purposes for which it exists. It having been settled that associations, under the law of 1838, are strictly corporations, their powers are, of course, to be interpreted according to this general rule, unless it clearly appears that the legislature intended to exempt them from its operation. It cannot be assumed, as evidence of such an intention, that the legislature did not mean that these associations should be corporations at all. It would be a judicial solecism to hold, at the same time, that they are corporations, and that the legislature did not intend to make them so. Neither can it be assumed that the legislature was ignorant of the rule in question, or the statutory provision which declares it. In full view, then, of this statute (1 R.S.,
600, § 3), it provided for the creation of this important class of corporations, without an intimation that they were to be exempted from the operation of the rule. Is not the inference, that they are not exempted, irresistible?
But the general banking law itself bears upon its face strong evidence that it was framed with an intelligent reference *Page 259 
to this rule. Unlike all previous banking laws, it contains scarcely a prohibitory clause. This is a striking fact, and one which must have a meaning. It may be said that the legislature, having provided for the security of the billholders, intended to leave these institutions in all other respects free and untrammeled. But is this consistent with the frame of the act? Section eighteen not only prescribes the general nature of the business which the association may carry on, but minutely defines the manner in which it is to be done. This was not only unnecessary, if the intention was as supposed, but is irreconcilable with such a design. Even without regard to the rule referred to, limiting the exercise of corporate powers, that universal and familiar rule, which is embodied in the maxim,expressio unius exclusio est alterius, would control the construction of this statute. The legislature having enacted that these associations may carry on the business of banking, by discounting bills, c., by receiving deposits, by buying and selling gold and silver bullion, c., it cannot be held that they can carry on the business in ways other than those prescribed, without doing violence to every sound rule of interpretation. The inference to be drawn from the omission of the usual prohibitory clauses seems plainly to be, that the legislature chose to leave all limitations of power to the operation of the well established principles to which I have referred. The wisdom of this course is manifest, since every prohibition implies a permission of that which is not prohibited.
It is clear, therefore, that this corporation, like all others, must find its authority for every act in the law under which it was organized. If not given in express terms, or necessary to the exercise of some power thus given, it does not exist. Can we find, then, in the general banking law, authority for issuing the various kinds of paper put forth by this company? I will consider the different kinds separately.
First, as to bills of exchange. The law authorizes, in express terms, banks organized under it to buy and sell "gold and *Page 260 
silver bullion, foreign coins and bills of exchange." Does this power include that of drawing bills of exchange by the bank itself; or is it confined to buying and selling bills drawn by others? To me, it seems plain that the power to draw bills is a necessary incident of the power to buy and sell them. Suppose the bank to buy a bill on London; it might or might not find a purchaser for the bill before it would become payable. If it did not, the bill must be remitted for payment. Could it not then draw for the proceeds? How otherwise could it realize them? It certainly could not be required to send a special messenger for the specie, and thus lose far more than all the profits of the transaction.
On this subject I concur in the reasoning of Senator BOCKEE, inSafford v. Wyckoff (4 Hill, 442). He says: "Buying and selling bills of exchange is an expressly granted power. It seems to me that the power of drawing bills is fairly included in, or at any rate is incidental to, the power of buying and selling. In the business of exchange, mutuality is necessity. If a banking association buy bills of exchange, and its funds accumulate at any point, why may it not draw, as well as sell, bills of exchange?" The accumulation of funds at remote points, of which the senator here speaks, must inevitably attend the business of a bank authorized to deal in exchange, and it would seem difficult to deny the power to draw for such funds. A comparison of the reasoning of Senator BOCKEE with that of Senator HOPKINS, in the case of Safford v. Wyckoff, has satisfied me that that case must have been decided upon the ground assumed by the former, viz., that banks, under the general banking law, have power to draw bills of exchange, as incidental to the power to buy and sell them. If, then, these banks may draw for their funds abroad, they must be permitted to draw in anticipation of such funds; otherwise much time, and of course interest, would be lost. The question is not presented, whether they would have the power to draw mere accommodation bills; as all the bills in this case appear to have *Page 261 
been drawn in the expectation that funds to meet them would be realized either from a sale of the securities in the hands of the Palmers, the drawers, or from other legitimate sources. The validity of the bills cannot be affected, so far as the Palmers are concerned, by the fact that they were drawn against state stocks which had been illegally purchased by the bank. The Palmers did not participate in the purchase of these stocks, and were in no way responsible for any illegality which may have attended such purchase. The Palmers were, no doubt, justified in assuming that the bank had acquired a legal right to the stocks; and there can be no doubt that the purchasers from the bank, through the Palmers, obtained a valid title to them. I see nothing in the case, therefore, to affect the validity of the bills of exchange. Even if some portion of them ought to be regarded as mere accommodation bills, still, as the bank had a general power to draw bills, such bills would no doubt be valid against the bank in the hands of a bona fide purchaser, and of course the Palmers would be justified in paying them. It is unnecessary to consider, at large, the effect of the act of 1840 upon this power, as only eight of the bills were drawn after that act took effect; and in the view I have taken of the case, the result could not be materially affected by the operation of the act upon these bills. Assuming, as I do for the purposes of this case, that these eight bills were drawn in contravention of this act, still, the bank, upon the principles hereafter advanced, would be bound to refund to the Palmers the money actually paid upon them. It is true, they cannot be allowed their commission upon these bills, unless it clearly appears that, when paid, the bills were held by parties in England, or elsewhere out of this state, who had become purchasers for value, without any actual notice of their illegality. If that is made to appear, the rights of the Palmers would, I think, be the same in all respects as if the act of 1840 had never been passed; because, although foreigners who deal with our corporations are presumed to know the extent of *Page 262 
the powers conferred upon such corporations by their charters, since they know that without a charter they can have no power whatever, yet I am not prepared to hold that they are bound to take notice of distinct and independent statutes, modifying the power which the organic act confers. I see no principles which would require them to assume that any such statute had ever been enacted.
I will next consider the so-called mortgage bonds. These were issued for the sole purpose of borrowing money, to be used as capital in carrying on the business of banking. Now, although, as has been shown, the use of borrowed capital is within the scope of legitimate and well regulated banking, it by no means follows that corporations created for banking purposes have a general power to borrow. That depends upon their charters and not upon the laws or rules of banking. No corporation in this state possesses the power to borrow money, unless that power has been conferred upon it by the legislature, either expressly or as incidental to some express power. It not being among the general powers enumerated in section one of the act concerning corporations, its exercise, unless authorized either specifically or by plain implication, is expressly prohibited by section three of that act. The doctrine advanced by Assistant Vice-Chancellor SANDFORD, in the case of Barry v. Merchants' Exchange Co. (1Sandf. S.C.R., 280), that any corporation, as such, has the capacity to take and grant property and to contract obligations, in the same manner as an individual, and that, unless specially restrained, it may borrow money for the purpose of accomplishing any object authorized by its charter, cannot be sustained.
The theory upon which this doctrine is based, viz., that corporations possess the same powers as individuals, except so far as they are specifically restrained, is in direct conflict with the statute, as well as with the common law rule, of which the statute is merely declaratory. We must look, then, to the general banking law, to ascertain whether, and *Page 263 
to what extent, this corporation could borrow money. By that act it was in effect authorized to borrow in two modes. First. By receiving deposits, which is a method of borrowing. As incidental to this power, it might, as I am willing for the purposes of this case to concede, agree to pay interest upon the money deposited, or give security by hypothecating its property. It might undoubtedly give a proper certificate as evidence of the deposit. All these acts may, perhaps, be fairly considered as necessary incidents of the power expressly conferred. But could the bank, instead of a mere certificate of deposit, give its negotiable promissory note on time for the money deposited? Let it be borne in mind that a corporation can exercise no powers whatever,i.e., can do no corporate act, except such as its charter authorizes. The language of the statute (1 R.S., 600, § 3) is, that beyond the powers expressly given, "no corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers so enumerated and given." The power to give even a certificate of deposit, therefore, could not be exercised except as incident to that of receiving deposits. Is the giving of a negotiable promissory note on time also an incident of the same express power? If there is no legal distinction between the two, if the certificate and the note are the same in substance and in legal effect, then of course the power to give one would include the power to give the other. But no one will maintain that they are the same. The difference is manifest. A certificate of deposit is a mere acknowledgment of the receipt of money. It contains no express promise to pay, and is not negotiable. The addition of negotiable words, or of a promise to pay at a specific time, converts it into a promissory note. (Bank of Orleans v. Merrill, 2 Hill, 295; Leavitt
v. Palmer, 3 Comst., 19.) But no one ever supposed it to be a promissory note without such words. When once converted into a promissory note, it becomes subject to an extensive and complex code of laws, which have no application *Page 264 
to it as a mere naked certificate. This code is so familiar that it would be idle to point out the difference which it creates between a negotiable promissory note and a mere certificate of deposit. To confound the two would be to confound all legal distinctions. It is no doubt proper for a bank, on receiving a deposit, to give a suitable acknowledgment of such receipt. The depositor needs it as evidence of the deposit. But to give a negotiable instrument, or one on time, is going beyond the necessities of the case. Such an instrument is more, much more, than mere evidence of the transaction authorized by the statute. It is a special contract, and one which cannot be said to grow necessarily out of the receiving of deposits. The ordinary certificate is plainly the only instrument which can be considered a necessary incident of the right to receive deposits. The power of giving evidences of debt in any other form for money borrowed, if it exists at all, must be derived from some other source.
The distinction, which thus plainly exists between a certificate of deposit and a promissory note, demonstrates the existence of a similar distinction between receiving a deposit, and other methods of borrowing. If the appropriate written evidences of two transactions materially differ, there must be a corresponding difference between the transactions themselves. Let us recur for a moment to the origin of banks of deposit. They were places where the various individuals of a commercial community could deposit for safe keeping those small sums which they must necessarily keep on hand to meet any sudden or unexpected demand. As neither all, or any considerable number of the depositors, were likely to call for their deposits at the same time, the bank could safely use a large portion of the money. But as the depositors could not, in general, foretell when their respective shares would be wanted, it was indispensable that they be at liberty to call for the money at any time. It will be seen, therefore, that it was essential to the very nature of a bank deposit *Page 265 
that it be kept always ready to meet the wants of the depositors. Agreeing to pay interest, or giving security for the money deposited, were neither of them at all inconsistent with the object of the arrangement; but to specify a time of payment clearly was so. It at once converted the transaction into an ordinary loan. Now what a bank deposit was in its origin, I apprehend it is still. Money on deposit means, ex vi termini,
money placed where the owner can command it at any time. A person may loan money to a bank for a specified time, as well as to an individual, provided the bank is authorized to borrow. But such a loan is not a deposit. That which makes the distinction between them plainly is, that the money in one case must be kept always ready, while in the other a day of payment is fixed. I hold it, therefore, to be entirely clear, that a bank cannot deduce from a mere authority to receive deposits, power either to issue negotiable promissory notes or to borrow money on time; Secondly. The power to borrow would no doubt result from the power to deal in exchange; at least to the extent of anticipating expected funds, and probably could not be limited even to that. Aside from this and the right of receiving deposits, no authority for borrowing money and giving its evidences of debt therefor can be found in the act, unless we adopt the construction of section eighteen, contended for by Senator HOPKINS, in Safford v.Wyckoff (4 Hill, 442), viz., that the incidental powers conferred by that section are coextensive with the necessities of the general business of banking, and are not limited to the particular method of banking prescribed by the act. If this construction is sound, then the principles of banking, and not the statute, constitute the proper measure of the incidental powers conferred. But is it sound? Let us see. Section eighteen provides that associations formed under the act "shall have power to carry on the business of banking by discounting bills, c., by receiving deposits, by buying and selling gold and silver bullion, * * * * and by exercising *Page 266 
such incidental powers as shall be necessary to carry on such business." Now, the extent to which the banks may exercise incidental powers depends upon the interpretation to be put upon the last two words, "such business." If these words refer to the general business of banking in its broadest sense, and not to that business as limited by the specifications contained in the section, then perhaps Senator HOPKINS is right. But there are serious objections to this construction. In the first place the powers specified, viz., discounting bills, receiving deposits, buying and selling bullion, c., are themselves mere incidents of the general business of banking. Why did the legislature specify these, if it intended by one sweeping phrase to confer all incidental power whatever?
It may be said that the specification of powers contained in section eighteen, was inserted for the purpose of exempting these associations from the provisions of the restraining act. This, however, is insufficient to account for that specification. The provisions giving power to buy and sell foreign coins and bills of exchange, as well as that of loaning money on real and personal security, could not have been inserted for that object, as they were wholly unnecessary for any such purpose. It would be disrespectful to the legislature, to suppose that it adopted a mere stereotyped phraseology, without motive or object. The rules for construing statutes require that significance should be given to every sentence and word. Besides, we have no right to assume that the legislature was ignorant of the rule embodied in the very common maxim, expressio unius exclusio est alterius; and the section in question, unless enacted in the most entire unconsciousness of that rule and maxim, must have been intended to exclude all other modes of banking, except those enumerated. Again, a power cannot be said to be conferred as incidental, when the power, of which it is claimed to be an incident, is itself withheld. Does section eighteen authorize these associations to carry on the business of banking at large, or only in the way there specified? Plainly, the *Page 267 
latter. The words, "by discounting bills, by receiving deposits,"c., qualify the previous general words. We should search in vain for any rule which would warrant a different construction. This is conclusive. The clause giving incidental powers, cannot, in the nature of things, be broader than that which confers the express powers to which they are incident. It is clear, therefore, that the authority to borrow, except in the two modes already referred to, cannot be deduced from the act, unless it is a necessary incident of some of the specified powers.
The express power to which borrowing may be most appropriately considered as incidental, is that given by section eighteen, to buy and sell "gold and silver bullion, foreign coins and bills of exchange." It must be conceded that if the doctrine advanced by the assistant vice-chancellor, in Barry v. Merchants' ExchangeCo. (1 Sandf. Ch. R., 280), and upon which not only that case, but the case of King v. The Same (2 id., 692), appears to have been decided, is sound, the power to purchase would include the power to borrow. In the first of these cases, he says: "A corporation, in order to obtain its legitimate objects, may deal precisely as an individual may who seeks to accomplish the same ends. If chartered for the purpose of building a bridge, it may contract a debt for the labor, the materials, or the land upon which the bridge is abutted. If more advantageous, it may borrow money to purchase such land or materials, or to pay for such labor." This doctrine entirely overlooks that manifest distinction between corporations and natural persons, upon which so many of the cases proceed. It is also in conflict with the statute. (1 R.S., 600, § 3.) It assumes that corporations must be specially restrained, to prevent their exerting the same power as individuals. This is the direct opposite of the true doctrine. It is true that a corporation, chartered to build a bridge, a hospital, or for any other specific object, may accomplish such object by means of its credit, and may give its bond or *Page 268 
its note for the debt contracted; but I deny that it can borrow the money for the purpose. The reasons for the distinction are these: The first is a contract made in direct furtherance of the object of the charter. If the corporation can resort to one indirect means of effecting the object, why not to any other which it may deem, in the language of the assistant vice-chancellor, "more advantageous," such as speculating in cotton, in flour, or other commodities, with a view of obtaining the necessary means from the profits of the trade? Again, if confined to the first mode, the amount of the indebtedness is strictly limited to the object of the incorporation; while, if permitted to borrow, there is no limit but a voluntary estimate, which may greatly exceed the amount required. But a still more conclusive reason is, that a contract made in the direct advancement of the object of the charter, secures the application of the credit obtained to that object, while the money borrowed may be diverted to any illegitimate purpose. It may be borrowed to build a hospital, and expended to build a theatre.
This point does not appear to have received any consideration in this court, in the case of King v. The Merchants' ExchangeCo. (1 Seld., 547). It is not alluded to in the opinion delivered, and was probably not seriously argued. I cannot consider that case as settling the question. The reasoning here adopted is not only in entire accordance with the general principles applicable to corporations, but with the decided cases in this state, with the exception of those, referred to above, against the Merchants' Exchange Company.
In Mott v. Hicks (1 Cow., 513), it was held that the Woodstock Glass Company, incorporated for the purpose of manufacturing glass, was liable on a promissory note, given by the president of the company, for wood furnished to carry on its legitimate business. No inference can be drawn, from this case, that the note would have been valid if given for money borrowed to buy the wood. *Page 269 
In Barker v. the Mechanics' Fire Insurance Company (3Wend. 94), the demurrer admitted that the note was given for "legitimate purposes." The plaintiff was of course, therefore, entitled to judgment, if the corporation could make a valid note for any purpose. As to that, Chief Justice SAVAGE said: "I am not prepared to say that they cannot give a note for many purposes, as fees, office rent, for the payment of a loss, for the payment of their officers, or agents, or servants employed by them, and for other considerations. If a note has been given which is unauthorized by law, that should be shown in the defence." I quote this language to show within what strict limits, in the opinion of the chief justice the power of corporations to give notes was confined. The same was held in the cases of Moss v.Oakley (2 Hill, 265), and Attorney-General v. The Life andFire Insurance Co. (9 Paige, 470).
In regard to the case of Safford v. Wyckoff (1 Hill, 11);S.C. (4 id., 442), as already remarked, the Court of Errors, in reversing the judgment of the Supreme Court must have proceeded upon the ground assumed by Senator BOCKEE, that the power to draw bills was a necessary incident of the power to buy and sell them, and not upon that taken by Senator HOPKINS, that every power which might be considered as incidental to the general principles of banking was conferred by the act. There is nothing, therefore, in this reversal which impairs in the slightest degree the force of what is said by Judge COWEN in the Supreme Court, and by Chancellor WALWORTH in the Court of Errors, so far as it applies to promissory notes and evidences of debt, other than bills of exchange. These cases, with others which might have been cited, show that any corporation authorized to carry on a particular business, to perform a specific work or to purchase a particular kind of property, may do either of these things upon a credit, and may give its obligations for the debts thus contracted, provided all its contracts are made in the direct furtherance of the authorized object. If, however, it goes one step beyond this in issuing evidences of debt *Page 270 
its acts are ultra vires, and cannot be upheld. There is no authority for holding that banks are exceptions to this rule; and unless that branch of the rule which denies to corporations the right to borrow money, except when specially authorized, is strictly adhered to, it will be found impossible to confine these bodies to the exercise of their legitimate powers.
While, therefore, banks organized under the general banking law may use their credit in the direct purchase of real estate within the prescribed limits, as well as of gold and silver bullion, foreign coins and bills of exchange, and probably also of state stocks to be deposited with the comptroller, and may give their obligations in appropriate forms for the debts thus incurred, they cannot borrow money for any of these objects, except in the modes specially authorized by the act. I admit the difficulty of distinguishing between different modes of borrowing money, the most substantial part of the contract being in all cases the same. But the necessity of making this distinction results from the nature of the limitations which law and reason impose upon the exercise of corporate power. Corporations are not only limited to the general objects for which they are created, but are required to accomplish those objects in the manner specified.
In Bank of the U.S. v. Dandridge (12 Wheat., 64), Mr. J. STORY says: "Corporations created by statute must depend both for their powers and the mode of exercising them upon the true construction of the statute itself." Chief Justice MARSHALL, also, in the case of Head v. The Providence Ins. Co., before referred to, speaking of the powers of the corporation, says: "It may correctly be said to be precisely what the incorporating act has made it: to derive all its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes." There are many other cases to the same effect.
When, therefore, a corporation is expressly enabled by statute to borrow in one mode, it is not authorized to borrow *Page 271 
in any other. It becomes the duty of the courts in such cases to discriminate between the different modes of effecting the same object. In cases like the present, where the difference consists in the nature and the form of the security given for the money borrowed, the difficulty of making the necessary discriminations is not very great. It is easy to distinguish between a negotiable promissory note and a certificate of deposit, and between a bond and a bill of exchange. It is equally easy to discriminate between a deposit payable on demand and a loan payable at a specific time. The line of distinction appropriate to this case, therefore, is far more definite and clear than that adopted inTalmage v. Pell, (3 Seld., 328), where the validity of the contract was made to depend upon the object or purpose for which the purchase was made. If the principles of that case are to be upheld, and if the established rules for the construction of statutes conferring corporate powers are to be observed, it would seem impossible to escape the conclusion that while banks, organized under the general banking law, may draw bills of exchange for funds, or in anticipation of funds, in the hands of their correspondents, and may execute mere certificates in proper form for moneys received upon deposit, they cannot issue their evidences of debt in any other form for money borrowed.
It follows, from these views, that the acts of the North American Trust and Banking Company, in issuing the so-called mortgage bonds, avowedly for the mere purpose of borrowing money to carry on its business, were ultra vires. This conclusion renders it unnecessary to consider whether these obligations are specialties or mere promissory notes; and we are brought directly to the question whether, having been issued without authority and in violation of law, they can be enforced against the corporation. Upon this point, we have listened to a most elaborate, learned and able argument from one of the respondents' counsel, against the soundness of the decision of this court, in the case of Leavitt v. Palmer *Page 272 
(3 Comst., 19), by which it was held that certain promissory notes of the North American Trust and Banking Company, issued in contravention of the provisions of the act of 1840, which prohibited the issuing by such institutions of any bill or note not made payable on demand and without interest, were void and could not be enforced against the bank.
That case was elaborately argued, by counsel of great eminence, and the judgment of the court was unanimous. It would, as a general rule, be inexpedient for this court to reconsider a point which it had thus deliberately decided; but the great importance of the question, the earnestness with which its consideration was pressed by the learned counsel, and the fact that the eminent judge by whom the opinion of the court was delivered did not enter at large into the discussion of this point, have induced me to look with some care into the grounds of that decision. This examination has satisfied me that the decision, in the particular in which it is now assailed, rests upon a basis of authority which cannot be shaken, even if we consider it as going the full length of holding that corporations are not bound by contracts which are ultra vires, although not expressly prohibited; which, perhaps, it does not do. The point has been repeatedly decided both in England and this country, and always in accordance with the decision in Leavitt v. Palmer.
The doctrine did not originate, in England, with the case ofEast Anglian Railway v. Eastern Counties Railway Co. (7 L. Eq. R., 505); nor, in this country, with the bank cases of this state or of the State of Michigan. The precise question arose in England in 1809, in the case of Lees v. The Proprietors, c. (11 East., 645). The action was for an alleged breach of covenant. To a plea that the corporation had not power to enter into the contract, the plaintiff demurred. The court of King's Bench overruled the demurrer, upon the broad ground that corporations are not bound by contracts which exceed the powers conferred upon them by their charters. *Page 273 
A similar decision was made in 1836, by the Court of Appeals of the State of Maryland, in the case of Penn., Del. Md. SteamNav. Co. v. Dandridge (8 Gill John., 248). It was urged, in that case, that the corporation was estopped from setting up its own want of power; but the court held otherwise, and decided that the contract could not be enforced. So far as I have been able to discover, no decision to the contrary has ever been made. The reason why the defence was not sustained in the case ofHill v. The Manchester Water-Works (2 Barn. Ald., 544), as given by Lord TENTERDEN, was that the pleas did not go far enough to raise the question. The remarks of Justices BAYLEY and HOLROYD, in that case, clearly indicate that if the point had been distinctly presented, the bond would have been held to be void, and not obligatory upon the company. The only dictum in opposition to the doctrine, which I have met with, is that of Mr. Justice ERLE, in The Mayor of Norwich v. The Norfolk RailwayCo. (30 L. Eq. R., 120). Even Lord ST. LEONARDS, in EasternCounties Railway Co. v. Hawkes (35 L. Eq. R., 8), although he held the company bound in that case, distinctly admits the general doctrine. In speaking of the decisions of the House of Lords on the subject, he says: "They do not authorize directors to bind their companies by contracts foreign to the purposes for which they were established; but they do hold companies bound by contracts duly entered into by their directors, for the purposes which they have treated, as within the object of their acts, and which cannot clearly be shown not to fall within them."
The decision in East Anglian Railway Co. v. Eastern CountiesRailway Co. (7 L. Eq. R., 505), which was directly upon the point, has not only never been overruled in England, but stands confirmed by the dicta of several of the judges in subsequent cases. (Gage v. The New Market Railway Co. 14 L. Eq. R.,
57; McGregor v. The Official Manager, c., 16 id., 180.) When to these cases, and those previously referred to, we add the cases in the Supreme Court *Page 274 
of the State of Michigan, Bank of Michigan v. Niles (1Doug. 401); Orr v. Lacey (2 id., 254); the cases in the circuit court of the United States, Root v. Godard (3McLean, 102); Root v. Wallace (4 id., 8); the case ofHood v. The N.Y. N.H. Railroad Co. (22 Conn., 502); and the series of cases in this state, viz., Safford v. Wyckoff
(1 Hill, 11); Smith v. Strong (2 id., 241); Swift v.Beers (3 Denio, 70); Leavitt v. Palmer (3 Comst., 19);Talmage v. Pell (3 Seld., 328); we have an array of authority which no court would be justified in disregarding. There are few legal principles upon which the authorities are more uniform and decided. Difficult, therefore, as may be the task of determining the validity of corporate acts, under a rule which requires us to have regard not only to the substantial nature and object of the act, but to the manner of its execution, we have, nevertheless, no alternative but to hold that corporations are not bound by contracts, made by their officers in their behalf, which exceed their corporate powers; and may set up their own want of power as a defence to such contracts.
It is impossible, then, to support the mortgage bonds as valid securities. Although I entertain very little doubt that all the present holders of the bonds, including the Messrs. Palmers, were, in point of fact, unconscious that any law was violated by issuing them, and wholly innocent of any actual intention to aid in such violation, yet the settled rules of law must be upheld. According to these rules, there can be no bona fide holders of the bonds, inasmuch as the trust deeds to which they especially refer, and of the terms of which every purchaser must therefore be presumed to have had knowledge, showed upon their face that the bonds were made for the purpose of being "sold" in market; in other words, for the purpose of borrowing money upon them. The purchasers are presumed also to have known the extent of the powers of the corporation, so far as those powers depended on the law under which it was organized. Knowing, as they must, that a positive act of the legislature was *Page 275 
necessary to give to such corporations any power, or even existence, they were bound to inquire into, and are presumed to have ascertained, what were the provisions of that act. Without this presumption, there could practically be no limitation upon corporate powers. It applies to foreigners, who deal with our corporations, no less than to our own citizens. The authorities on this subject are numerous and uniform, and I need not refer to them. Whether in the case of foreigners the presumption extends to other statutes, modifying or restricting the powers conferred by the organic act, is a different question. I have already said that I doubt its going to that extent; but this is not material here. My conclusion therefore is that the mortgage bonds are void, and cannot be enforced against the corporation, by whomsoever held.
It will facilitate our inquiries as to other parts of the case, to consider here the question, whether the purchasers of the bonds (I use the word purchasers, for convenience merely) have any remedy for the sums actually advanced by them in their purchase, upon the supposition that the only objection to the bonds is that the bank exceeded its powers in issuing them. It does not follow, because the special contract cannot be enforced, that the purchasers have no equitable claim against the corporation. The latter has received the money and appropriated it to its own use. It has given no consideration whatever in return; and upon the plainest principles of justice, therefore, it is bound to refund. Under such circumstances, the law, in all ordinary cases, implies a promise to repay. It would clearly do so in this case, where the equity is so strong and undeniable, unless there is some controlling reason to the contrary. The reason given by the counsel for the receiver is, that the contract, of which the bonds are the evidence, is illegal, and that the law will not aid either party to such a contract.
Now there are some distinctions in regard to illegal contracts, which courts must observe if they would not be led *Page 276 
to the most absurd and unjust conclusions. Contracts are illegal which are malum in se, and which involve criminality or gross immorality. Contracts are illegal, also, which would otherwise be entirely innocent, but which are prohibited on some ground of policy by positive statute. So, too, we may admit, contracts made by corporations, which exceed their corporate powers, are in some sense illegal. But is that logic sound which infers, from the applicability of this common term to all these different contracts, that the same consequences must necessarily attend all? It would be just as rational to conclude, that because to murder is wrong, to steal is wrong, and not to pay one's debts is wrong, therefore the thief and the defaulting debtor, as well as the murderer, should suffer death.
It was assumed upon the argument, that if the word illegal could be shown to be applicable to the contracts of the bank, then all claim against its effects was at an end; thus making this important question to turn, not upon the nature of the transaction or the culpability of the parties, not upon the questions of public policy which the case involves, but upon a mere question of lexicography. I deny that one inflexible and unvarying rule is to be applied to all contracts which may be said to be illegal, without regard to their nature or the relative guilt of the parties. It is substantially true, in respect to actions brought directly upon and alleging the validity of the illegal contracts. But in regard to the adjustment of the rights and equities of the parties between themselves, where the illegal contract, not being malum in se,
has been executed, and money has been paid or property received under it, the rule has always varied according to the nature of the case, and the principles of justice and policy which it involves. The following passages from Story on Con., are in accordance with this position. In section four hundred and eighty-nine, he says: "But although a contract is equally void, whether it be malum in se or merely malum prohibitum, yet the position of the parties, as to their *Page 277 
remedies, is not the same in both cases." In section four hundred and eighty-six, he says: "An illegal contract will never indeed be enforced, if it be executory; but if it be executed in spite of a statute or rule of public policy prohibiting it, relief will often be granted, not only by setting aside the agreement, but by ordering a repayment of the money paid under it. But relief will never be granted when the parties are in pari delicto, unless in cases where public policy would be thereby promoted; for it is not the benefit of the party, but of the public, which is regarded."
That the question whether relief shall be granted to one party to an illegal contract, against another, when the contract has been executed, is not governed by one uniform, unbending rule, especially in equity, is shown by a great number of cases. See note four to the case of Hatch v. Hatch (9 Ves., 292), in which the editor says: "Where a transaction contravening public policy has taken place, relief may be given at the suit of aparticeps criminis;" citing Lord St. John v. Lady St. John
(11 Ves., 535); Jackson v. Mitchell (13 Ves., 587);Whittingham v. Burgoyne (3 Anst., 904); Gilbert v.Chudleigh, before Lord HARDWICKE. In the last of these cases, Lord HARDWICKE said: "It was urged for the defendant that this is a bill brought by one of the parties to this corrupt contract against a representative of the other, who is a stranger to it; and that, although an executor, might have claim for relief, for the sake of providing assets, yet the court will show no favor to either of the parties themselves. But the truth is, that in these cases of the violation of public policy, it is indifferent who stands before the court, if the intention of the contract be evident; because the court does not regard the state and condition of the parties so much as the nature of the contract and the public good." There are many other cases to the same effect, but these are sufficient to show that, where the illegality of a contract consists, not in its being either malumin se or malum prohibitum, but in its contravening public policy, relief may *Page 278 
be given to either party upon principles of policy, notwithstanding their participation in the illegal contract.
If, that a contract made by a corporation is ultra vires,
proves it to be illegal, the illegality belongs clearly to the class referred to in these cases, and not to the class styledmala prohibita. The statute (1 R.S., 600, § 3), is simply declaratory of a preëxisting rule. It prohibits no particular acts, or even class of acts, and adds nothing indeed to the force of the common law. It is clear that contracts, which are ultravires, are held void at the instance of the corporations making them, simply because public policy requires the enforcement of the rule which limits corporate bodies to the exercise of their legitimate powers. To hold their express contracts void, if unauthorized, will no doubt promote the observance of this limitation. It operates as a salutary restraint upon both parties, by depriving each of the power of enforcing an advantageous bargain. But, to go farther, and hold that corporations, when called upon not to perform that which formed the inducement to the contract with the other party, but simply to return what they have received without consideration, may set up their own violation of law as a defence, would be to offer a direct premium for the fraudulent abuse of their powers. I cannot doubt that a sound public policy will be promoted by restoring the parties, in all such cases, to their original position. It leaves no inducement for either party to contravene the law. The corporation is compelled to return just what it has received; the other party gets no more than he has parted with. It is believed that not a solitary case can be found which stands opposed to this just and salutary rule.
The most plausible branch of the argument against this doctrine is, not that which rests upon the law of illegal contracts, but that which is drawn from the law of principal and agent. It is said that the directors are merely the agents of the stockholders, and that all parties dealing with such agents are presumed to have knowledge of the extent of *Page 279 
their powers, so far as they depend upon their charters, and hence, upon the established principles of the law of agency, the stockholders are to be protected; that the latter are entitled to the benefit of a presumption that they have not authorized any act which is ultra vires, and should, therefore, be permitted to retain the money received upon the illegal contract, to indemnify them against losses which they may have sustained through the abuse of their powers by their agents the directors. The answer to this argument is, that it is only in suits between the stockholders and the corporation, or its directors, that the courts can recognize any distinction between the individual rights of stockholders and those of the corporation as a body. In cases between third persons and the corporation, the stockholders are not personally before the court. It is their corporate rights only that are represented, and none other are recognized. There are not, in such cases, three parties to the suit, viz., the plaintiff, the corporation and the stockholders, but the two former only; and the court can take no notice of any rights, except such as appertain to the parties and the public.
It is indispensable, if we would avoid confusion on this subject, to distinguish between cases like the present and that class of English cases where the question of excess of authority by the directors of a company depends, not upon the extent of the corporate powers conferred by a public statute, but upon a deed of settlement, inter partes. These deeds of settlement not only specify the general purposes and objects of the company, but prescribe and limit the powers of the directors, as between them and the shareholders; and as provision is made by law for the registry of such deeds, all parties dealing with the company are presumed to know the extent of the authority conferred by the shareholders upon the directors. In actions against such companies, therefore, ultra vires frequently means no more than that the directors have exceeded the powers conferred upon them, by the deed of settlement, as the agents of the *Page 280 
shareholders. The defence, which in such a case is really entertained for the benefit of the shareholders, would be entirely overthrown by showing that the shareholders had themselves authorized the act. But in cases where the allegation is, that the powers of the entire corporation, stockholders included, have been exceeded, the defence would be in no way affected by proof that every shareholder had concurred in the act. No issue could be framed in such a case to which that proof would be relevant; and the court is not at liberty to assume a fact which could neither be proved or disproved. It cannot assume that the directors have acted against the wishes or without the authority of the shareholders, when the contrary, if true, could not be shown. The court, therefore, in deciding such a case, has no right to take into consideration the interest of the stockholders as distinct from that of the corporation. The latter is looked upon as an entity, and as fully represented by the directors. To confound these two species of defence, one depending upon the laws of corporate power, and the other upon the law of principal and agent, would lead to numerous absurdities. The distinction, if properly observed, will serve to explain many things said by the judges, in the modern English cases, which would otherwise be inexplicable.
For instance, the language of Lord CAMPBELL, in the case ofRoyal British Bank v. Turquand (5 Ellis Black., 248), cannot be reconciled with his opinions in several other cases, except by observing this distinction. He there says: "A mere excess of authority by the directors, we think, of itself, would not amount to a defence." This might seem, at first, to be in direct conflict with the doctrine, that a corporation may set up in its defence that the contract sued upon is ultra vires. But this is explained by referring to the plea, which sets out the deed of settlement, and avers that the directors had exceeded the powers conferred upon them by this deed. Lord CAMPBELL, in speaking of the plea, says: "It alleges that, as between the directors and the shareholders, *Page 281 
the directors exceeded their authority in executing the bond, but without adding that this was known to the plaintiffs, or that it was to the prejudice of the shareholders." It clearly is not essential to a defence, which sets up that a contract is ultravires, as between the corporation and the public, that it should appear that the shareholders have been injured. The remark of Lord CAMPBELL on this subject, applies only to a case where the defence is that the officers of the company, as between them and the shareholders, have exceeded their powers. That the defence, when it rests upon the allegation that the powers conferred upon the whole corporation have been exceeded, is entertained on grounds of public policy alone, without regard to the individual rights or interests of the stockholders, is not only clear upon principle, but has often been judicially asserted.
In The Mayor of Norwich v. The Norfolk Railway Co. (30 L. Eq. R., 120), ERLE, J., says: "These suits in equity, between different members of the company, have no analogy to actions at law by third persons against the corporations, either in respect of the parties to the suit or the subject in litigation. As to the parties, in actions against corporations, the members thereof, in their individual capacity, are strangers to the suit, and the rights of persons who contract with corporations are unaffected by the rights of members inter se." So in Edwards
v. The Grand Junction Railway Co. (1 Myl. Craig, 650), it was argued that to enforce the plaintiff's claim would be "unjust towards the shareholder;" but to this the chancellor replied, that the court could "not recognize any party interested in the corporation, but must look to the rights and liabilities of the corporation itself." This language of the lord chancellor is quoted with approbation by Lord ST. LEONARDS, in the case of theEastern Counties Railway Co. v. Hawkes (35 L. Eq. R., 8.) There are other authorities to the same effect, but it is unnecessary to refer to them. It is clearly on the grounds of public policy that corporations are permitted to allege their own *Page 282 
want of power as a defence to actions brought upon their contracts, and not upon any theory of affording protection to the stockholders, as principals, against the unauthorized acts of their agents. The argument, therefore, attempted to be drawn from this source, against the giving of equitable relief to the respondents, is manifestly unsound.
In holding, however, that corporations are bound, upon a contract which the law will imply, to refund money obtained by means of an agreement which it had no right to make, it is proper to say that the receipt of the money, and its appropriation to the use of the corporation, must be established by proof, independently of the illegal contract itself. That contract, being void, cannot be resorted to for any purpose. In this case, however, the proof is abundant.
It is said, that, as all the transactions in which the directors of the bank were engaged were ultra vires, none of the moneys received and expended in the course of those transactions can properly be said to have been paid to and used for the benefit of the corporation. This is a criticism which I think the case will not warrant. In the first place, the bills of exchange were valid, and consequently all moneys applied to their payment, or in discharge of the debt created by their payment, were used in the strictest sense for the benefit of the company. So of moneys applied to the payment of certificates, post notes or debentures, in the hands of bona fide holders without notice. This would undoubtedly cover a large proportion of the claims. But aside from this, I think all these operations having been carried on in the name of the bank, and avowedly for its benefit, as a part of its regular business, are to be considered, as between the bank and the persons with whom it dealt, at least after being carried into effect, as corporate acts; although so long as they remained executory, the courts, as a matter of policy, might have refused to recognize them as valid.
There can be no doubt that everything acquired by the directors in the course of these transactions, would be *Page 283 
regarded, as between them and the corporation, as the property of the latter. The law looks upon the acts of the directors, ostensibly in the business of the corporation, as corporate acts, and, as has already been shown, presumes them to have been authorized by the corporate body itself. Even the tortious acts of corporate officers, if committed while such officers are engaged in the execution of that which is within the scope of the general purposes of the corporation, will be presumed to have been authorized, and the corporation held responsible. (Yarborough v. Bank of England, 16 East., 6; Duncan v.Surrey Canal, 3 Stark., 50; Chestnut Hill, c. Turnpike Co. v. Rutter, 4 Serg. Rawle, 6; Thayer v. The City ofBoston, 19 Pick., 511.)
It follows, from the principles which have been adopted, that all who have advanced money to the Company upon the mortgage bonds, have, so far as the defence rests upon the ground that the acts of the bank in issuing them were ultra vires, valid claims against the assets of the bank to the extent of the money advanced, with interest. To this the Palmers are no exception, even admitting their complicity in the transaction to be fully established; because, as we have already seen, where contracts are held void, as is the case with corporate contracts which areultra vires, on grounds of public policy, relief will be given to the parties, as against each other, without regard to the question whether they are in pari delicto.
In Lord St. John v. Lady St. John (11 Ves., 526), Lord ELDON says: "It is said, supposing the instrument void by the policy of the law, it may be of great importance at the hearing to see what has been the conduct of the plaintiff, as upon that the court may stand neuter and let him take the chance at law. I have considerable doubt upon that; for the authorities go to this, that where the transaction is against policy, it is no objection that the plaintiff himself was a party in that transaction which is illegal." Similar language is used in many other cases. The same reasoning *Page 284 
will of course prove that every other claim for money, actually had and received by or paid for the company, is valid, so far as the objection is concerned, that the acts of the company in creating the debt were ultra vires, although every special contract in relation to such debt is void. No other claim, therefore, need be examined with reference to this objection.
But it is contended that both the mortgage bonds, and the certificates of deposit or post notes were issued in violation of the restraining act. (1 R.S., 712, §§ 3, 6.) If this be so, then the acts of the banks in issuing them were not merely ultravires and against the policy of the law, but were specially prohibited. In that case, the question whether relief will be given depends upon principles somewhat different from those which apply to cases where the illegality of the contract consists merely in its being in contravention of public policy. It will not be necessary, however, definitively to decide whether the restraining act has been violated or not; because, in the view I take of the case, the determination of that point, either way, would not materially affect the result. This I shall proceed to show.
Here, again, we encounter the position, that one common consequence attends every contract which is for any cause illegal, not only in reference to the validity of the contract itself, but in respect to the rights and remedies of the parties, as against each other, upon its disaffirmance. I have already shown this position to be erroneous, as applied to the contracts of a corporation, where the only illegality consists in their being ultra vires. It is no less erroneous when applied to many contracts which are mala prohibita. When the contract is malumin se, it is conceded that neither party is entitled to relief as against the other; but, to use the language of an elementary writer, "when the contract is malum prohibitum, and does not involve any moral turpitude or criminality, one party may, under some circumstances, have a remedy against the other party, on an executed or *Page 285 
executory contract; and this rule is admitted on grounds of public policy. And first, if the contract be executed, the title of either party to relief will depend upon whether both parties are in equal fault, in pari delicto. If they be in paridelicto, no relief will be granted, but they will be left remediless; their contract will not be set aside, and any money which may have been advanced cannot be recovered. But if they be not in pari delicto, the rule is directly the reverse. (Storyon Con., §§ 490, 491.) The cases cited by the learned author abundantly sustain this position. Among them are Browning v.Morris (Cowp., 790); Jacques v. Golightly (2 W. Bl.,
1073); Jacques v. Withy (1 H. Bl., 65); Williams v.Hedley (8 East., 378); White v. Franklin Bank (22Pick., 181); Atlas Bank v. Nahant Bank (3 Met., 581.) These are the cases upon which this court relied in making its recent decision in regard to the claim of the State of Indiana in the case of Tracy v. Talmage. The earnestness with which it has been contended that the cases were misapplied upon that occasion, induces me to bestow a few words upon them here. It surely cannot be said of two of these cases that they are not in point. In White v. Franklin Bank, the action was brought to recover money which the bank had received, pursuant to a contract expressly prohibited by statute under a severe penalty. That case cannot be distinguished in principle from the present, upon the point in question. The two are substantially identical in all respects, except that in the present case the action, instead of being against the bank itself, is against a receiver. But in the case of the Atlas Bank v. The Nahant Bank there was not even this unimportant difference. The action there was against a receiver. In both these cases the claims against the bank were sustained. If they were rightly decided, then it is undeniable that the decision in the case of the State of Indiana was right, and equally clear that the claims of the respondents in this case are valid, to the extent of the moneys actually received by the bank. *Page 286 
But I rely with no less confidence upon the English cases referred to, as supporting the same conclusions. They not only establish a general principle, viz., that relief will be given whenever the parties are not in pari delicto, but suggest a criterion by which to determine, in most cases, which is the guilty party. The only criticism to which these cases are open, in connection with their application to the present case, is, that they were decided exclusively upon the narrow ground that the law violated was enacted for the special protection of one of the parties. Let us see whether the reasoning in those cases does not establish a broader principle. Jacques v. Golightly, was an action brought to recover back money paid to the defendant for issuing lottery tickets, contrary to a statute of 14 GeorgeIII. The counsel for the plaintiff argued that the act of insuring was "not criminal in itself, but made so by act of Parliament, and only made so in the party who keeps the office and insures, and not in the party insured." This argument appears to have been sustained by the court. BLACKSTONE, J., says: "These lottery acts differ from the stockjobbing act (97 George II.,ch. 8), because there both parties are made criminal and subject to penalties. * * * But here, on the part of the insured the contract on which he has paid his money is not criminal, but merely void; and therefore, having advanced his premium without any consideration, he is entitled to recover it back." Not one word is said in this case about the statute having been made to protect one of the parties from imposition by the other; but the decision is placed distinctly upon the broad ground that, as the penalty is imposed upon the defendant only, he alone is to be regarded as the guilty party.
The next case in order of time was that of Browning v.Morris (Cowp., 790). In this case, it is true, LORD MANSFIELD refers to a class of cases, in which he says the statute violated was enacted especially to protect one of the parties from oppression or imposition by the other; and it is no doubt to be inferred that he considered the case before him as belonging *Page 287 
to that class. But he also recognizes and adopts the argument of the counsel, and of Mr. Justice BLACKSTONE, in Jacques v.Golightly. He says: "And it is very material that the statute itself, by the distinction it makes, has marked the criminal, for the penalties are all on one side, upon the office keeper. The man who makes the contract is liable to no penalty." Now, if Lord MANSFIELD meant to hold that the principle was confined to cases where the statute was enacted for the special protection of the party bringing the suit, it was miserable logic to use an argument which applied with equal force to a hundred other cases. If the argument means anything, it must mean that when a contract, not otherwise criminal or immoral, is prohibited by statute, and the penalty is imposed upon one party only, the other party is not to be regarded as particeps criminis, or at least not as in pari delicto.
In the subsequent case of Jackson v. Withy (1 H. Bl.,
65), the argument turned entirely upon the soundness of the doctrine that the party upon whom the penalty was imposed was to be regarded as the only guilty party. Sergeant BOND, for the defendant, argued that "Though the penalty might only attach on one, both were, in the eye of the law, to a certain degree, criminal." In speaking of the case of Jacques v. Golightly,
he said: "Notwithstanding the doctrine laid down by Mr. Justice BLACKSTONE in that case seems to imply that the office keeper alone was criminal, it was not necessary to decide so much," and he cited Lowry v. Bordieu (Doug., 468). Sergeant ADAIR, in reply, said: "In the case of Lowry v. Bordieu, the judgment of the court was founded on the circumstances of both parties being equally culpable. Here the keeper of the lottery office is the only person upon whom the prohibition or penalty attaches." It would, I think, be difficult to prove that this case was decided upon a ground not alluded to in it, and not upon that upon which the whole argument was made to turn. *Page 288 
But the doctrine was reiterated in the still later case ofWilliams v. Hedley (8 East., 378). There the action was brought to recover back money which had been paid by the plaintiff to the defendant, to compromise a qui tam action, brought by the defendant against the plaintiff, contrary to the provisions of a certain statute. The objection made to the plaintiff's right to recover was, that the plaintiff was in paridelicto with the defendant, as to the illegal compromise of the penal statute. Lord ELLENBOROUGH states the objection, and then says: "The answers given to it on the part of the plaintiff were, first, that the plaintiff, who was defendant in the action for usury, was not prohibited by the statute of Elizabeth, ch. 5, § 4, from agreeing to this composition, and paying the money which Hedley received under it; but that the prohibitions and penalties of the statute, in this respect, solely attached upon and were confined to the informer or plaintiff in the penal action, * * * and did not attach upon or extend to the defendant, the person compromised with." He adds, "And such, indeed, by comparing the language of the fourth section of this statute, by which the penalties are created, with the language of the third section, by which the prohibition is declared, appears to have been the true sense and intention of the legislature." Nothing could be more explicit than this; and that the paragraph here quoted embraced, in the opinion of the reporter, the real point of the decision, is shown by the head note of the case. It is impossible to state the doctrine for which I am contending with greater emphasis and clearness than it is stated in that head note.
By no fair analysis of the four cases here referred to, can it be shown that they do not directly and fully support the very reasonable doctrine that when a statute prohibits, under a penalty, an act not otherwise criminal or immoral, parties upon whom the prohibitions and penalties of the law do not attach, although they may participate to some extent in the illegal act, are not to be regarded as in pari delicto with *Page 289 
the principal offender. They were so understood by the supreme court of Massachusetts, in White v. Franklin Bank (supra). The court there say, after citing and commenting upon these cases: "The principle is, in every respect, applicable to the present case, and is decisive. The prohibition is particularly leveled against the bank, and not against any person dealing with the bank. In the words of Lord MANSFIELD, the statute itself, by the distinction it makes, has marked the criminal. The plaintiff is subject to no penalty, but the defendants are liable, for the violation of the statute, to a forfeiture of their charter."
It is the prohibitory law itself, in all such cases, which discriminates as to the relative guilt of the parties. The courts do not determine whether they are in pari delicto, by scrutinizing the circumstances of the case, but adopt the distinction marked out by the statute.
Among the numerous cases cited by the receiver's counsel, not one, so far as I am able to understand them, conflicts with this rule. They were mostly actions founded upon and seeking to enforce the illegal contract itself; and in none of them was this precise question considered. The case of Gillett v. Phillips
(3 Kern., 114), which is one of the cases cited and relied upon by the counsel, tends impliedly to support the doctrine for which I contend. Chief Justice GARDINER there says: "The contract was not only unauthorized, but illegal. No action could be sustained upon it, if executory, in his favor, nor to set it aside if executed. Nor could it become the foundation of an implied assumpsit, in behalf of the offending party." This qualification plainly admits that an implied contract may arise in such cases, in favor of a party who is not in pari delicto with the chief offender.
In Perkins v. Savage (15 Wend., 412), also cited by the receiver's counsel, the plaintiff having been the party principally concerned in the illegal transaction, and for whose especial benefit it was devised, could not of course recover. *Page 290 
That case, therefore, is without weight upon the question. But Judge NELSON, in giving his opinion in that case, cites the case of Stokes v. Twichen (8 Taunt., 492), which is worthy of notice. The plaintiff had apprenticed her son to the defendant, and had advanced £ 60 as an apprentice fee; but the indenture was illegal and void, it having omitted to state the fee paid, in order to evade the stamp duty. The action was brought to recover back the £ 60; and the plaintiff rested her claim upon the precise ground taken here, viz., that as the statute violated imposed a penalty upon the master or mistress only, the plaintiff was notin pari delicto with the defendant; citing Jacques v.Golightly, and the other cases upon which I have commented. It cannot, I think, be said that in this case the statute was made for the special protection of one of the parties from imposition or extortion by the other; and yet Chief Justice GIBBS says: "It has been contended for the plaintiff, in this case, that no imputation rests on her, for that it was the master's duty to insert the premium, on whom alone the legislature imposes the penalty for the default. This latter proposition is true, and if the case rested here I should be of opinion that the plaintiff was entitled to recover; but there are other circumstances which deeply implicate the plaintiff in a collusion for the purpose of fraud." Here is another distinct recognition of the doctrine that, where an act is prohibited by statutes, the person upon whom the penalty is imposed is to be regarded, prima facie, as the guilty party. There is no doubt that the penalties of the restraining act attach solely upon the corporation, its officers, and those acting in its behalf, and not at all upon those dealing with the corporation.
The propriety of applying the principle which has been advanced to the present case is, I think, apparent, when it is considered that public policy lies at the basis of the law of illegal contracts, and that all general rules are made to yield to this policy. Judge STORY even goes the length of *Page 291 
conceding that, nowithstanding the parties are in pari delicto,
relief may still be given, if sound policy seems to require it. He says: "Relief is not granted, where both parties are truly inpari delicto, unless in cases where public policy would be thereby promoted." And again: "There may be, on the part of the court itself, a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be." (1 Story Eq. Jur., §§ 298, 300.) There are some cases which go even beyond these extracts. In Neville v.Wilkinson (1 Bro. Ch. R., 543), Lord THURLOW, to use the language of the reporter, "declared his opinion that in all cases where money was paid for an unlawful purpose, the party, thoughparticeps criminis, might recover at law; and that the reason was, that if the courts of justice were to prevent the perpetration of crimes, it must be, not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before."
But while I would not adopt the broad rule here laid down by Lord THURLOW, that money paid for an unlawful purpose may, in all cases, be recovered back, I nevertheless hold that to permit corporations, when called upon to restore what they have obtained from unwary parties by an abuse of their corporate powers, to set up their own misconduct in defence, would be to convert the law into an instrument for subverting its own cherished policy. I adopt on this subject the language of Judge WILDE, in White v.Franklin Bank (supra). He says: "To decide that this action cannot be maintained, would be to secure to the defendants the fruits of an illegal transaction, and would operate as a temptation to all banks to violate the statute, by taking advantage of the unwary and of those who may have no actual knowledge of the existence of the prohibition of the statute, and who may deal with a bank without any suspicion of the illegality of the transaction on the part of the bank." This argument, to which I can perceive no satisfactory *Page 292 
answer, does not prove that it is contrary to public policy to permit corporations to defend themselves against their express contract, when illegal. No rule better calculated to promote sound policy could be devised than that which denies to either party the power of making a profit by the illegal transaction, and barely allows to the more innocent the right of being restored to his original condition. As I think this is the rule to which the authorities clearly point, I have no hesitation in adopting it, irrespective of the question whether the respondents are chargeable with knowledge of the illegality or not. Even with the knowledge, they would not be brought within the penalties of the restraining act. Assuming, then, that the provisions of the restraining act have been violated, the grounds of the relief afforded are: that as the prohibitions and penalties of that act are imposed upon the corporation alone, the respondents are not to be considered as in pari delicto with such corporation; and that public policy imperatively requires that this distinction, which exists in the nature of things and is supported by numerous authorities, should be observed in cases of this kind.
It may be objected to this doctrine, that there is a manifest incongruity in raising, by implication, a contract on the part of the corporation, which, it is at the same time held, would be void if expressly made. This objection however is, I think, without weight. If the incongruity referred to were real, it would be of little moment, as the implied contract is a mere legal fiction, resorted to simply for the purpose of complying with the forms of law. In equity no such implication is needed, and the objection, therefore, has no force when applied to the present case. The necessity of resorting to the fiction of a contract grows entirely out of the form in which justice is administered in common law actions. But the supposed incongruity does not really exist. It has never been held that a corporation could not promise to restore money or property acquired *Page 293 
without consideration and by an abuse of its powers. Its promises, in anticipation of and with a view to such acquisitions, are void. But it is not ulta vires for a corporation to be honest, or to do, or promise to do, that which justice demands. Again, there can be no difficulty, in a case like the present, for another reason. The bank had a right to receive money on deposit, that is, to borrow money payable on demand; and its contracts to borrow the money in question on time being void, the law may properly regard the money as deposited, and the bank as liable to repay it whenever called for. An express contract by parol to that effect would no doubt be valid.
The conclusions to which I have thus arrived render it unnecessary to examine in detail the various claims, with one or two exceptions which will be hereafter noticed. They are all limited to the amount actually advanced, with legal interest thereon. It remains, however, to be considered whether the respondents, or either of them, have any lien, for the sums so advanced, upon the securities assigned by the trust deeds. In the case of Leavitt v. Yates (4 Edw. Ch. R., 134), where a banking association had issued post notes in violation of the restraining act of 1840, and had, at the same time, executed a trust deed assigning certain effects to secure the payment of the notes, the vice-chancellor held that, the notes being void, the trust deed was also void. A similar decision was made by the Supreme Court at general term, in the case of Tylee v. Yates
(3 Barb. S.C.R., 222). The principle adopted in these cases was fully confirmed by this court, in the case of Leavitt v.Palmer (3 Comst., 19).
But it is claimed by the respondents that, admitting the mortgage bonds and trust deeds to be equally void, still, the holders have an equitable lien upon the property assigned by the deeds, for the money advanced; and they base their claim upon the ground that they advanced their money upon the faith of and relying upon these securities. The *Page 294 
claim of the Palmers to a preference is urged upon the additional ground that, upon receiving a pledge of the mortgage bonds, they surrendered state stocks upon which they had a lien for their debt against the bank. Upon careful consideration, I find myself unable to sustain this claim as to the bondholders; they have participated in a transaction, the whole of which was in contravention of law, and they stand chargeable with constructive notice of its illegality, at least so far as the objection is concerned that the acts of the bank in issuing the bonds wereultra vires. Although they are permitted, chiefly on grounds of public policy, to recover the money actually advanced, it would scarcely comport with that policy to allow them preferences over other creditors, to which they are only entitled by virtue of a special agreement which is held to be void. The law, upon considerations of justice and policy combined, implies a promise to restore to the bondholders their money; but I am aware of no principle upon which it will also imply a contract to give them a preference over others, in violation of the rule that "equality is equity."
I omit the examination of various questions and of several minor branches of the case, which it would have become necessary to consider had the principles here advanced been adopted by the court, and shall content myself with the general conclusion that the trusts are void, and that the receiver is entitled to the entire fund, to be distributed ratably among all the creditors of the company. The judgment of the supreme court ought, I think, to be reversed.
DENIO, Ch. J., having been of counsel, did not sit in the case.
The court adopted the following propositions unanimously, except as otherwise noted:
1. The million and half million trusts mentioned in the pleadings and proofs are not void under the eighth section *Page 295 
of the statute "to prevent the insolvency of moneyed corporations." (1 R.S., 59].)
2. The said trusts are not void under the ninth section of said statute; it being the opinion of the court that they were not made with intent to give a preference to particular creditors over other creditors. (Judge SELDEN not voting.)
3. The trusts are not void under the statute (2 R.S., 135, § 1), on the ground that they were made for the use of the North American Trust and Banking Company; it being the opinion of the court that the statute applies only to conveyances, c., primarily for the use of the grantor, and not to instruments for other and active purposes, where the reservations to the grantor are incidental and partial. (Judge SELDEN not voting.)
4. The said trusts were not made with intent to hinder, delay or defraud creditors, and therefore they are not void on that ground. (Judge SELDEN not voting.)
5. The North American Trust and Banking Company had power to borrow money, and prior to the 3d day of June, 1840, banking associations could lawfully issue time paper to secure a debt for moneys loaned, with or without the corporate seal, provided such paper was not intended or calculated to circulate as money, and the trust bonds in the two trusts were not of a description falling within this proviso. (Judge SELDEN dissenting, but not on the ground that the said bonds were calculated or intended for circulation.)
6. Prior to the said 3d of June, 1840, the said trust bonds were issued and pledged to Palmer, Mackillop, Dent Co., in London, to secure their debt and future advances, with power to sell the same, according to the original design of the trust. Such pledge was valid, and it entitles the Palmers, c., still holding three hundred and seventy-seven of the million and one hundred and eighty of the half million bonds under the same, to the benefit of the two *Page 296 
trusts along with other bondholders. (Judge SELDEN not voting.)
7. The said bonds, when so issued and pledged, and when portions of the same were sold, were English contracts, and the loans or advances procured on the sale of four hundred and ninety-nine of them belonging to the million trust were not usurious by the then existing laws of England, being exempted from the usury laws of that country by the statute of 2d and 3d Victoria, ch. 37. (Judge SELDEN not voting.)
8. Even if said loans upon the four hundred and ninety-nine bonds were usurious, the appellant, as receiver, representing, as he does, the corporation, is prohibited by the statute of this state, passed in 1850, ch. 172, from setting up the usury in these cases in any stage thereof.
9. The holders of the said four hundred and ninety-nine bonds are therefore entitled to share in the benefit of the million trust. (Judge SELDEN not voting.)
10. The loan, nominally, of $250,000, procured from the Philadelphia banks, was a Pennsylvania contract; and although it may have been usurious, nevertheless, by the laws of that state, the contract was inoperative only for the excess of interest over six per cent, the lawful interest.
11. The pledge of the two hundred and seventy half million bonds to said banks was valid, although the twelve certificates of deposit, amounting to $250,000, issued by said company, were prohibited by the statute of May 14, 1840, which took effect June 3, 1840; it being the opinion of the court that the intention and legal effect of the pledge were to secure the payment of the money loaned, and it being also the opinion of the court that the alleged voidness of the certificates of deposit, issued for the repayment of such loan, does not affect anything else in the contract. (Judge SHANKLAND dissenting, on the ground that the pledge is void upon the authority of Leavitt v. Palmer, 3Comst., 19.) *Page 297 
12. The assignees of the said Philadelphia banks have therefore a right to share in the benefit of the half million trust, as holders of the two hundred and seventy bonds. (Judge SHANKLAND dissenting as above, and Judge SELDEN not voting.)
13. The Messrs. Holfords Co. have a right to share in the million trust, as pledgees and holders of twenty-four of the bonds in that trust. (Judge SHANKLAND dissenting as above, and Judge SELDEN not voting.)
14. The general account of Palmers, Mackillop, Dent Co. against the North American Trust and Banking Company, including the advances made by them to take up the Davis bills, so-called, constitutes a legal and valid debt, to be reduced, however, by computing interest at five per cent only, instead of seven per cent, and by striking out the commissions on the sale of so many of the million bonds as they themselves purchased.
Decree modified accordingly.